[No. B187691. Second Dist., Div. Four. July 30, 2007.]

MAGIC KITCHEN LLC et al., Plaintiffs and Appellants, v.
GOOD THINGS INTERNATIONAL, LTD., et al., Defendants and
Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Under California Rules of Court, rules 8.1105 and 8.1110, only the Introduction, Facts and Procedural History, Discussion I.A. and B., and Disposition are certified for publication.

COUNSEL

Francis C. J. Pizzulli for Plaintiffs and Appellants.

HamptonHolley, George L. Hampton IV and Colin C. Holley for Defendants and Appellants Good Things International, Ltd., Ten Mark Corporation and The Pampered Chef, Ltd.

McDermott Will & Emery and Mark P. Wine for Defendant and Appellant The Pampered Chef, Ltd.

OPINION

SUZUKAWA, J.—

## INTRODUCTION

From the mid-1980's until 1993, defendant and respondent The Pampered Chef, Ltd., purchased a kitchen device known as the Tartmaster from plaintiff and appellant Kitchen Connection, Inc. In about 1993, Pampered Chef learned that the patents on the Tartmaster's design had expired, and it began sourcing copies of the Tartmaster (which it called the Cut-N-Seal) from defendants and respondents Good Things International, Ltd. and Ten Mark Corporation. Kitchen Connection discovered no later than mid-1993 that Pampered Chef was sourcing Tartmaster copies, but it waited nearly 10 years, until 2003, to file the present suit for trade dress infringement, unfair competition, and false advertising.

Plaintiffs' trade dress claims were presented to a jury. After both sides presented their evidence, the trial court granted a directed verdict for defendants, concluding that the claims were barred by laches and the statute of limitations as a matter of law. Then, sitting without a jury, the court further found for defendants on the unfair competition and false advertising claims. Subsequently, it denied defendants' motions for attorney fees.

Plaintiffs appeal the judgment for defendants, and defendants Good Things and Ten Mark appeal the denial of their motions for attorney fees. We find no error, and we affirm.

## FACTS AND PROCEDURAL HISTORY

### I. *The Parties*

Appellant Kitchen Connection is an Illinois corporation that manufactures and sells kitchen utensils. Appellant Ursula Kaiser (Kaiser) is the founder and

sole shareholder of Kitchen Connection. Appellant Magic Kitchen LLC is a California limited liability company that Kaiser formed in December 2002, shortly before filing this action.

Respondent The Pampered Chef is an Illinois-based company that sells kitchen tools through home parties. Respondents Goods Things International and Ten Mark Corporation are Taiwanese corporations that source products for overseas companies, including Pampered Chef.

## II. *Pampered Chef's Purchase of Tartmasters from Kitchen Connection*

Doris and Jay Christopher formed Pampered Chef in 1980. From the mid-1980's until 1993, Pampered Chef purchased a variety of kitchen products from Kitchen Connection. One such product was the Tartmaster, a hand-operated metal device used to cut and crimp the edges of dough and bread to make tarts and crustless sandwiches. Pampered Chef purchased Tartmasters from Kitchen Connection in two sizes: 3-inch and 4-inch. Pampered Chef also purchased from Kitchen Connection a cookbook Kaiser authored called Pasta, Pies, and Pastries: Tart Recipes from around the World, which described recipes that could be made using the Tartmaster. The cookbook's back cover showed "3 easy steps" for making pasta, pies, and pastries using the Tartmaster: "fill," "cut 'n seal," and "cook."

Pampered Chef sold Tartmasters to consumers in plastic bags labeled "The Pampered Chef Tartmaster." Kitchen Connection never required Pampered Chef to identify the Tartmaster as a Kitchen Connection product, and Pampered Chef apparently never did so.

## III. *Pampered Chef's Sourcing of the Cut-N-Seal from Good Things and Ten Mark*

In about 1992, Pampered Chef learned that the patent for the Tartmaster design had expired and the design was in the public domain. Subsequently, in early 1993, Pampered Chef stopped buying Tartmasters from Kitchen Connection. At about the same time, it began sourcing three-inch and four-inch versions of the product, which it called the Cut-N-Seal, from Good Things and Ten Mark in Taiwan. The Cut-N-Seal had the same basic design as the Tartmaster, but was made of stainless steel and used a different spring. Additionally, each Cut-N-Seal was imprinted with the words "Cut-N-Seal" and "The Pampered Chef." Pampered Chef sold Cut-N-Seals under the same product numbers it formerly had used with the three-inch and four-inch Tartmasters.

In July 1993, Kaiser discovered that Pampered Chef was having copies of the Tartmaster made in Asia. On July 15, 1993, she sent a letter to Doris Christopher saying that she was "surprised to see that you are . . . carrying both the 3[-inch] and the 4[-inch] Tartmaster," as well as shaped pancake molds that Pampered Chef formerly had purchased from Kitchen Connection. In the letter, Kaiser asserted patent rights to the pancake molds and warned that Pampered Chef's sale of those products was actionable patent infringement. However, she did not claim any intellectual property rights to the Tartmaster.

Between 1993 and 2003, Pampered Chef made a "substantial investment" in the Cut-N-Seal, which included traveling to Asia, promoting the product, and developing recipes for its use. In the late 1990's, Pampered Chef developed and marketed a three and a half-inch version of the Cut-N-Seal, and it subsequently stopped selling the three-inch and four-inch versions.

When the 3½-inch Cut-N-Seal was introduced in 2000, the product and its "use and care" instructions were marked "patent pending." No patent application was ever filed, however, and the "patent pending" designation was removed from the Cut-N-Seal in 2002 and from the use and care instructions in 2002 or 2003. After that time, Pampered Chef affixed a sticker stating "No patent pending are issued for this product" on erroneously marked products that remained in stock.

## IV. *The Present Action*

Plaintiffs filed the present action in January 2003. The operative first amended complaint, filed May 1, 2003, alleged eight causes of action: (1) unfair competition in violation of Business and Professions Code section 17200 (section 17200) (first cause of action); (2) false advertising in violation of Business and Professions Code section 17500 (section 17500) (second cause of action); (3) trade dress infringement in violation of section 43 of the Lanham Act (15 U.S.C. § 1125) (third and fourth causes of action); (4) unfair competition and false advertising in violation of 15 United States Code section 1125 (fifth cause of action); (5) conspiracy to commit fraud (sixth cause of action); (6) conspiracy to interfere with contractual relations and prospective economic advantage (seventh cause of action); and (7) unjust enrichment (eighth cause of action).

Plaintiffs' primary factual allegation, on which all eight causes of action were based, was that the Cut-N-Seal infringed the Tartmaster's trade dress. Plaintiffs also alleged that defendants committed unfair trade practices and

false advertising by transacting business in California without obtaining a certificate of qualification from the Secretary of State and by imprinting the 3½-inch Cut-N-Seal "pat. pending," even though it never applied for a patent for that product. Plaintiffs sought injunctive and other equitable relief, "profits, damages, and costs in the amount to be proved at trial" and exemplary damages.

Plaintiffs dismissed the sixth and seventh causes of action without prejudice prior to trial. They dismissed the fifth cause of action immediately prior to opening statements.

V. *The Trials and Judgment*

A. *The Jury Trial*

The parties tried plaintiffs' remaining causes of action over 17 court days between May 24 and August 18, 2005. In the first phase of the trial, the parties tried to a jury the third and fourth causes of action for trade dress infringement under the Lanham Act and the eighth cause of action for unjust enrichment. In the second phase of the trial, the parties tried to the court the first cause of action for violation of section 17200 and the second cause of action for violation of section 17500.

At the close of plaintiffs' case before the jury, defendants filed motions for nonsuit. Good Things and Ten Mark sought nonsuit on the third, fourth, and eighth causes of action on the grounds that they were barred by the statute of limitations and laches. Pampered Chef sought nonsuit on the third and fourth causes of action on the ground that plaintiffs failed to establish essential elements of trade dress infringement and lacked standing. Each defendant joined, to the extent applicable, in the motions for nonsuit made by the other.

The court deferred ruling on the nonsuit motions. At the conclusion of testimony, the defendants renewed their motions for nonsuit and, in the alternative, also sought a directed verdict. The court heard argument and then granted the motions for nonsuit or, in the alternative, for directed verdict on the third, fourth, and eighth causes of action.

With regard to the statute of limitations and laches, the court concluded it was undisputed that defendants began manufacturing and distributing three-inch and four-inch Cut-N-Seals in 1993, and that Ursula Kaiser became aware of those activities no later than July 15, 1993. The court further found it

undisputed that defendants began manufacturing and selling three and a half-inch Cut-N-Seals in 2000, and that the three and a half-inch Cut-N-Seal was identical to the three-inch and four-inch versions except for its size.

The court found that under Ninth Circuit case law, a claim is presumed to be barred by laches if any part of the alleged wrongful conduct occurred outside the applicable limitations period. Here, the court said, the limitations period was three years. Thus, because plaintiffs waited 10 years to file suit—more than three times the limitations period—and failed to offer a legitimate excuse for their lengthy delay, their claims presumptively were barred by laches.

Furthermore, the court said, there was undisputed evidence of prejudice. Although Doris Christopher conceded she could not specifically quantify Pampered Chef's development costs, she testified that there were significant costs associated with contacting and developing relationships with manufacturers, traveling to Taiwan, creating molds and promotional materials, printing catalogs, and producing Cut-N-Seals. Moreover, there was evidence that Pampered Chef had purchased millions of Cut-N-Seals from Good Things. The court stated: "That shows a substantial investment in time in the manufacture of the devices, the 3-inch, 4-inch, and later 3-and-a-half inch, and a substantial investment of cost with respect to the cost of goods sold and a substantial investment in capital for producing those units as well as substantial investment in marketing and advertising. Those numbers speak for themselves with regard to substantial prejudice in waiting ten years to bring the lawsuit."

Finally, the court rejected plaintiffs' contention that there were triable issues of fact regarding defendants' alleged unclean hands. The court found that defendants had admitted copying plaintiffs' product, but said that the "act of copying which defendants have acknowledged . . . is not sufficient in and of itself to show unclean hands." Instead, "[t]here has to be willfulness and the intentional infringement on the rights, and that is a knowing infringement on the rights." Here, the court said, there was no evidence of knowing infringement. It explained: "[T]he evidence with regard to this is that plaintiff has not met any burden to establish a prima facie case that defendants knowingly intended to infringe on the rights of the plaintiffs. Doris Christopher testified that she understood that . . . her company had the right to produce the Cut-N-Seal and that she had made changes in it to make it stainless steel and that after she started manufacturing it, then she also found out that the plaintiff didn't have any patent rights in it in any event. However,

there is no evidence to support a claim that the defendants intentionally with knowledge of the plaintiffs' rights intended to infringe on the trade dress."

Thus, the court concluded: "[T]he claims in the third and fourth causes of action are beyond the statute of limitations period and beyond any laches period because it has been shown that there is unreasonable delay of ten years in bringing the lawsuit, that the delay has been prejudicial to the defendants, and that the plaintiff has not demonstrated any unclean hands on the part of the defendants to negate the implications of the statute of limitations and laches."

The court also addressed the asserted untimeliness of the eighth cause of action for unjust enrichment, which was asserted against Good Things and Ten Mark only. The court explained that the eighth cause of action essentially duplicated the third and fourth causes of action and thus was also barred by laches. Additionally, the court found that plaintiffs failed to demonstrate either a direct relationship between the plaintiffs and these defendants or a direct benefit conveyed by the plaintiffs to these defendants.[1]

### B. *The Court Trial*

In the second phase of trial, the parties tried to the court the first and second causes of action for unfair competition and false advertising under sections 17200 and 17500. After plaintiffs rested, defendants made a motion for judgment. The court deferred ruling and heard additional evidence. After defendants rested, the court entered judgment for defendants on both causes of action. We discuss the trial court's analysis of these causes of action in detail in part II, *post.*

### C. *Entry of Judgment*

The court entered judgment on September 16, 2005, and notice of entry of judgment was served September 22, 2005. The court denied plaintiffs' timely motions for new trial and to vacate the judgment on November 17, 2005.

---

[1] The court also addressed defendants' alternative claim that plaintiffs lacked standing to assert the third, fourth, and eighth causes of action. The court found that: (1) the undisputed evidence demonstrated that Magic Kitchen did not acquire any assets, rights, or claims from Kitchen Connection and, therefore, it lacked standing to assert claims against the defendants, and (2) the undisputed evidence demonstrated that Kaiser had no interest in her personal capacity in any cause of action because all rights to the Tartmaster were held by the Kitchen Connection. The court initially found that Kitchen Connection also lacked standing, but it later reversed itself and, thus, denied the motion for nonsuit or directed verdict on the ground of lack of standing.

## VI. *The Attorney Fee Motion*

Defendants moved for attorney fees under the Lanham Act on December 28, 2005. Plaintiffs opposed. On February 28, 2006, the trial court denied the motion. It explained that the Lanham Act permits an award of fees to the prevailing party only in "exceptional cases," and that a case is exceptional for purposes of the statute when it is " ' "groundless, unreasonable, vexatious, or pursued in bad faith." ' " In the present case, the court found, "the matter was intensively, with great effort and complexity litigated and brought to trial. The court does not find that the plaintiffs' claims are totally groundless or unreasonable, and the mere fact that the case had determinations based upon the statute of limitations does not mean that the case is groundless or unreasonable for the purpose of awarding attorneys' fees under section [*sic*] 15 U.S.C. section 1117(a), and for that reason, the court is going to deny the motions for attorneys' fees."

Plaintiffs timely appealed from the judgment, and Good Things and Ten Mark filed a timely cross-appeal from the denial of their motion for attorney fees.

## DISCUSSION

### I. *The Trial Court Properly Directed a Verdict for Defendants on the Third, Fourth, and Eighth Causes of Action*

#### A. *Standard of Review*

" 'A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]' (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630 [85 Cal.Rptr.2d 386]; *Newing v. Cheatham* (1975) 15 Cal.3d 351, 358–359 [124 Cal.Rptr. 193, 540 P.2d 33].) This court decides de novo whether sufficient evidence was presented to withstand a directed verdict. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].)" (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46–47 [43 Cal.Rptr.3d 874].)

#### B. *Third and Fourth Causes of Action: Federal Lanham Act Claims For Trade Dress Infringement*

Plaintiffs' third and fourth causes of action allege trade dress infringement under section 43 of the Lanham Act (15 U.S.C. § 1125) in connection

with the three-inch and four-inch Cut-N-Seals (third cause of action) and the three and a half-inch Cut-N-Seal (fourth cause of action). "[T]rade dress 'refers to the "total image of a product" and may include features such as size, shape, color, color combinations, texture or graphics.' *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989)." (*Continental Laboratory Products, Inc. v. Medax Intern., Inc.* (S.D.Cal. 2000) 114 F.Supp.2d 992, 997; see *Roulo v. Russ Berrie & Co., Inc.* (7th Cir. 1989) 886 F.2d 931, 935 (*Roulo*).) The design of a product, as well as its packaging, both are part of its "trade dress." (*Fuji Kogyo Co., Ltd. v. Pacific Bay Intern., Inc.* (6th Cir. 2006) 461 F.3d 675, 683.) "A seller's adoption of a trade dress confusingly similar to a competitor's constitutes unfair competition that is actionable under section 43(a) of the Lanham Act." (*Vision Sports v. Melville Corp., supra*, 888 F.2d at p. 613, citing *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.* (7th Cir. 1986) 781 F.2d 604, 608.)[2]

■ The purpose of trademark and trade dress protection is to enable a business "to identify itself efficiently as the source of a given product through the adoption of a mark which may be in the form of a slogan, symbol, ornamental design or other visual insignia." (*Roulo, supra*, 886 F.2d at pp. 935–936.) However, trade dress protection "is not intended to create patent-like rights in innovative aspects of product design. [Citation.] Thus, trade dress protection, unlike patent law . . . , does not foster innovation by preventing reverse engineering or copying of innovative product design features. [Citation.] 'Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products.' [Citation.] Therefore, trade dress protection extends only to incidental, arbitrary or ornamental product features which identify the product's source. [Citation.]" (*Shire US Inc. v. Barr Laboratories, Inc.* (3d Cir. 2003) 329 F.3d 348, 353.) A mark or trade dress that is fanciful, arbitrary, or otherwise distinctive is given protection more readily than a generic or descriptive trademark or trade dress that is functional since appropriation of generic words, marks, or dress would prevent producers from accurately describing or denoting the quality or content of their goods. (*Roulo, supra*, 886 F.2d at pp. 935–936.)

---

[2] "To establish trade dress infringement, [a plaintiff] must show (1) that its product design is non-functional, (2) that the design is inherently distinctive or has acquired a secondary meaning, and (3) that there is a likelihood of confusion. [Citation.] Because affording trade dress protection to product designs may hinder legitimate competition, the Ninth Circuit has advised district courts to evaluate such claims with greater scrutiny than claims involving other forms of trade dress." (*Continental Laboratory Products, Inc. v. Medax Intern., Inc., supra*, 114 F.Supp.2d at p. 997; see also *Roulo, supra*, 886 F.2d at p. 935.)

On appeal, plaintiffs contend that the trial court erred in granting defendants' motions for directed verdict because there are triable issues of fact as to whether plaintiffs' trade dress claims were timely. Defendants disagree; they also contend in the alternative that plaintiffs' trade dress claims fail on the merits.

As a preliminary matter, we must determine whether the timeliness of plaintiffs' claims should be measured by the legal defense of the statute of limitations or the equitable defense of laches. Plaintiffs contend that under the law of many circuits, only laches applies to Lanham Act claims; defendants urge that both laches and statute of limitations apply.

█ As applied to Lanham Act claims, "[t]he proper interplay between laches and the statute of limitations . . . is somewhat elusive." (*Jarrow Formulas, Inc. v. Nutrition Now, Inc.* (9th Cir. 2002) 304 F.3d 829, 836 (*Jarrow Formulas*), citing Rest.3d Unfair Competition, § 31, com. a [discussing the uncertain role of the statute of limitations for Lanham Act claims].) Although the Lanham Act contains no explicit statute of limitations, some federal cases hold that Lanham Act claims are governed by the statute of limitations applicable to analogous state law claims. (E.g., *Karl Storz Endoscopy America v. Surgical Tech.* (9th Cir. 2002) 285 F.3d 848, 857 ["Storz's Lanham Act claims are subject to a three-year statute of limitations which began to run upon Storz's actual or constructive knowledge of the wrong"].) Other cases disagree, suggesting that since "[s]ection 43(a) monetary relief is 'subject to the principles of equity,' 15 U.S.C. § 1117(a)" and "injunctive relief is similarly available 'according to the principles of equity[,]' [*id.*] § 1116(a)," Congress might have intended that laches be the sole timeliness bar to suit. (*Jarrow Formulas, supra*, 304 F.3d at p. 836.)

█ Federal appellate authority thus is split as to whether a statute of limitations applies to Lanham Act claims or whether, instead, laches is the only applicable timeliness defense. However, we need not resolve the issue. Because we conclude that plaintiffs' claims are barred by the equitable defense of laches, we need not decide whether they also are barred by the statute of limitations.

█ Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that "equity aids the vigilant, not those who sleep on their rights." (*Lyons Partnership, L.P. v. Morris Costumes, Inc.* (4th Cir. 2001) 243 F.3d 789, 797–798 (*Lyons*); see also *Jarrow Formulas, supra*, 304 F.3d at p. 835 [" 'one who seeks the help of a court of equity must not sleep on his rights' "].) It is well established that laches is a valid defense to Lanham Act claims. (*Jarrow Formulas, supra*, 304 F.3d at p. 835; *GoTo.Com., Inc. v. Walt*

*Disney Co.* (9th Cir. 2000) 202 F.3d 1199, 1209; *Kason Industries v. Component Hardware Group* (11th Cir. 1997) 120 F.3d 1199, 1203.)

A defendant must demonstrate three elements to successfully assert a laches defense: (1) delay in asserting a right or a claim; (2) the delay was not reasonable or excusable; and (3) prejudice to the party against whom laches is asserted. (*Miller v. Glenn Miller Productions, Inc.* (9th Cir. 2006) 454 F.3d 975, 997; *Jarrow Formulas, supra*, 304 F.3d at pp. 835, 838; *Kason Industries v. Component Hardware Group, supra*, 120 F.3d at p. 1203.) We consider each of these three elements below.

### 1. *Delay*

The first element of laches is delay, as measured by the period "from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense." (*Danjaq LLC v. Sony Corp.* (9th Cir. 2001) 263 F.3d 942, 952 (*Danjaq LLC*).) If a Lanham Act claim is filed within the analogous state limitations period—here, no more than four years[3]—the strong presumption is that laches is inapplicable. If the claim is filed after the analogous limitations period has expired, the presumption is that laches bars the suit. (*Danjaq LLC*, at p. 952; see also *Miller v. Glenn Miller Productions, Inc., supra*, 454 F.3d at p. 997; *Lyons, supra*, 243 F.3d at p. 799; *Hot Wax, Inc. v. Turtle Wax, Inc.* (7th Cir. 1999) 191 F.3d 813, 821 (*Hot Wax*).)

***Three-Inch and Four-Inch Cut-N-Seals.*** It is undisputed that plaintiffs learned that Pampered Chef was selling three-inch and four-inch Cut-N-Seals no later than July 1993, when Ursula Kaiser "saw a catalog and saw that The Pampered Chef copied my Tartmaster." Because plaintiffs did not file the present action for nearly 10 years—well after either a three-year or four-year statute of limitations would have run—it presumptively is untimely.

Plaintiffs contend that although the alleged trade dress infringement began in 1993, their claims nonetheless are timely because "where a civil con-

---

[3] Plaintiffs contend that the state law claim most analogous to their federal trade dress infringement claim is for unfair practices under section 17200. Thus, they contend that the applicable statute of limitations is four years. (Bus. & Prof. Code, § 17208.) Defendants disagree, urging that the three-year statute of limitations for fraud and mistake claims applies. (Code Civ. Proc., § 338, subd. (d).) We need not resolve this question because, as we discuss below, plaintiffs filed this action more than four years after they learned of the allegedly infringing conduct. Thus, whether the statute of limitations is three years or four years is not material to resolving this appeal.

spiracy is properly alleged and proved, the statute of limitations 'does not begin to run on any part of plaintiff[s'] claims until the "last overt act" pursuant to the conspiracy has been completed.' " Whatever the merits of this contention generally, it has no application here. Plaintiffs initially pled two causes of action for conspiracy—to commit fraud (sixth cause of action) and to interfere with contractual relations and prospective economic advantage (seventh cause of action)—but dismissed them prior to trial. Moreover, plaintiffs' appellate briefs do not cite any evidence of a conspiracy. Thus, plaintiffs cannot pursue this issue on appeal. (*Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1486 [45 Cal.Rptr.3d 560] ["It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the specific pages where the evidence can be found"].)

Plaintiffs also contend that even if some of their infringement claims are untimely, they nonetheless are entitled to damages sustained within the applicable limitations period. We do not agree. Under federal law, when evaluating whether laches bars a damages claim, a continuing tort is considered a single act rather than a series of separate acts. In *A.C. Aukerman Co. v. R.L. Chaides Const. Co.* (Fed.Cir. 1992) 960 F.2d 1020, for example, the court rejected the plaintiff's contention that some of defendant's alleged acts of patent infringement were not barred by laches because they occurred within the applicable limitations period. The court explained: "[Plaintiff] asserts that it is improper to utilize laches as a defense to completely bar recovery of prefiling damages flowing from a continuing tort, such as patent infringement. We understand [plaintiff] to be arguing that, because each act of infringement is deemed a separate claim, the laches defense, like a statute of limitations, must be established separately with respect to each such act. [Citation.] [¶] [Plaintiff's] theory conflicts with the precedent of the Supreme Court in which laches has been applied against continuing torts . . . . In those cases, as well as in our precedent and that of other circuits, laches has been viewed as a single defense to a continuing tort up to the time of suit, not a series of individual defenses which must be proved as to each act of infringement, at least with respect to infringing acts of the same nature. [Citation.] To that extent, continuing tortious acts may be deemed to constitute a unitary claim." (*Id.* at p. 1031.)

Many other federal courts have concluded similarly. (E.g., *Jarrow Formulas, supra*, 304 F.3d at p. 837, quoting *Danjaq LLC, supra*, 263 F.3d at p. 953 ["the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period. To hold otherwise would 'effectively swallow the rule of laches, and render it a spineless defense.' "]; *Bridgestone/Firestone v. Auto. Club de l'Quest* (Fed.Cir. 2001)

245 F.3d 1359, 1364 ["The Automobile Club also argues that laches can not apply to its [Lanham Act] § 2(a) claim because Bridgestone's trademark use of LEMANS is a 'continuing wrong' for which every use is a new injury. However, when the obligation arises to assert an objection to a trademark registration, that obligation is not postponed by continued use of the trademark."]; *Hot Wax, supra*, 191 F.3d at p. 821 ["Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely. It would certainly be inequitable to reward this type of dilatory conduct and such conduct would necessarily warrant application of laches in appropriate circumstances."].) Thus, if defendants' alleged trade dress infringement began outside the limitations period, plaintiffs may not recover damages allegedly suffered within that period.

■ Plaintiffs also claim that even if their Lanham Act claims are otherwise barred by laches, laches cannot bar their claim for prospective injunctive relief. Plaintiffs are correct that *Lyons, supra*, 243 F.3d at page 799, supports this proposition, but we think the better rule is articulated in other federal appellate decisions that hold that the presumption of laches is triggered if *any* part of the claimed wrongful conduct occurred beyond the limitations period. (E.g., *Jarrow Formulas, supra*, 304 F.3d at p. 840 [rejecting plaintiff's contention that even if laches were otherwise applicable, it should not bar claim for prospective injunctive relief]; *Danjaq LLC, supra*, 263 F.3d at pp. 959–960 [district court properly applied laches to bar claim for prospective injunctive relief where "the feared future infringements are identical to the alleged past infringements"]; *E-Systems, Inc. v. Monitek, Inc.* (9th Cir. 1983) 720 F.2d 604, 607 ["Laches can bar recovery in trademark or tradename actions where injunctive relief is sought"].) Thus, plaintiffs' request for prospective injunctive relief does not alter our conclusion that their claims regarding the three-inch and four-inch Cut-N-Seals presumptively are untimely.

*Three and a Half-Inch Cut-N-Seal.* Plaintiffs contend that even if their infringement claims are untimely as to the three-inch and four-inch versions of the Cut-N-Seal, they are timely as to the three and a half-inch version because Pampered Chef did not introduce it until April 2000, less than three years before this suit was filed. We do not agree.

■ As we have concluded, the relevant delay for laches purposes is " 'the period from when the plaintiff knew (or should have known) of the *allegedly* infringing conduct.' " (*Tillamook Country Smoker v. Tillamook Cy. Creamery* (D.Or. 2004) 311 F.Supp.2d 1023, 1032 (*Tillamook*), quoting *Danjaq LLC, supra*, 263 F.3d at 952.) Thus, where a family of products is alleged to

infringe on a competitor's trademark or trade dress, courts have held that delay is measured from the time the plaintiff became aware of "the conduct which [it] claims is infringement," not the introduction of each individual product. (*Tillamook*, at p. 1032.)

 In *Tillamook, supra*, 311 F.Supp.2d 1023, the defendant began using its allegedly infringing trade name more than 30 years before plaintiff filed suit. The defendant claimed that the plaintiff's suit was barred by laches; the plaintiff contended that the delay period for laches purposes began just five years before suit was filed, when the defendant began using its trade name in connection with a particular package design. (*Id.* at pp. 1030–1033.) The court rejected the plaintiff's analysis and held the suit barred by laches. It explained that when evaluating the timeliness of an infringement claim, the relevant delay is the period during which the plaintiff knew about the conduct that forms the "crux of [its] infringement claim." (*Id.* at pp. 1031–1032.) Because the "crux" of the plaintiff's infringement claim was the defendant's use of the trade name Tillamook Country Smoker, *not* its use of a particular package design, its claim "effectively is 'the same trademark infringement case it had' well over ten years ago" and, hence, was barred by laches. (*Id.* at p. 1037; see also *Deere & Co. v. MTD Holdings Inc.* (S.D.N.Y. 2004) 2004 WL 324890.)

In the present case, the "crux" of plaintiffs' infringement claim is the design of the Cut-N-Seal—which plaintiffs contend "slavishly copied" the Tartmaster design—not the product's size. It was undisputed at trial that the design of the three and a half-inch Cut-N-Seal was the same as its three-inch and four-inch predecessors. Indeed, Kaiser herself conceded that the three and a half-inch Cut-N-Seal had the "same design" as the three-inch and four-inch versions and that there is "no difference" between the three-inch and three and an half-inch Cut-N-Seals. Accordingly, since the Cut-N-Seal's size is irrelevant to plaintiffs' trade dress claim, the claim as to the three and a half-inch Cut-N-Seal "effectively is 'the same . . . infringement case it had' " 10 years ago. (*Tillamook, supra*, 311 F.Supp.2d at p. 1037.) Thus, it too presumptively is barred by laches.

### 2. *Reasonableness of the Delay*

 The next element of laches is the reasonableness of the delay. "Delay has been held permissible, among other reasons, when it is necessitated by the exhaustion of remedies through the administrative process, [citation]; when it is 'used to evaluate and prepare a complicated claim,' [citation]; and when its purpose is 'to determine whether the scope of proposed infringement will justify the cost of litigation,' [citation]. By contrast, delay is impermissible when its purpose is to capitalize on the value

of the alleged infringer's labor, by determining whether the infringing conduct will be profitable." (*Danjaq LLC, supra,* 263 F.3d at p. 954.)

Here, plaintiffs have presented no legally sufficient justification for their delay. Their only claims in this regard are that Pampered Chef "was put on notice as early as July 15, 1993 that [Kitchen Connection] considered the knockoff Cut-N-Seal product to be violative of its rights" and that Pampered Chef and Kitchen Connection " 'had already been litigating claims' against each other for at least 'six years.' " Plaintiffs suggest no reason why litigating other matters or putting Pampered Chef on notice that they considered its conduct improper should justify delay in litigating this matter, nor do they cite any authority for the proposition that other litigation between the parties is relevant to the reasonableness of delay. Accordingly, we find that the trial court properly concluded that plaintiffs' delay was unreasonable as a matter of law.

### 3. *Prejudice to Defendants*

The final element of laches is prejudice. " 'A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be "inequitable" in light of the delay in bringing that claim . . . [and] ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.' " (*Hot Wax, supra,* 191 F.3d at p. 824; see also *Danjaq LLC, supra,* 263 F.3d at p. 955 ["A defendant may . . . demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly"].)

Plaintiffs' opening brief asserts in an argument heading that defendants were not prejudiced by the nearly 10-year delay in bringing the present suit, but it neither makes an argument nor cites any authority in support. The contention therefore is waived. (E.g., *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215 [4 Cal.Rptr.3d 519] (*Moulton*) ["Contentions are waived when a party fails to support them with reasoned argument and citations to authority"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) The waiver is not cured by argument and citations in plaintiffs' reply brief: "It is elementary that points raised for the first time in a reply brief are not considered by the court." (*Levin v. Ligon, supra,* 140 Cal.App.4th at p. 1486; see also *Campos v.*

*Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [67 Cal.Rptr.2d 350] [same].)

Even if we did not deem plaintiffs' "no prejudice" argument waived, we nonetheless would reject it. Courts have found prejudice sufficient to support a finding of laches where, as a result of a plaintiff's delay in bringing suit, a defendant has invested resources in developing and marketing a product. In *Hot Wax, supra,* 191 F.3d 813, the plaintiff, a car wax manufacturer, sued a competitor for misrepresenting the qualities of its competing car wax product. The district court entered summary judgment for the defendant, concluding that laches barred plaintiff's claim. (*Id.* at p. 818.) The appellate court affirmed, finding clear prejudice to defendant. It explained: "Hot Wax permitted Turtle Wax's advertising and the development of its products to go unchecked for well over a ten- to twenty-year period. During this time, Hot Wax sat idly by and chose not to challenge Turtle Wax's use of the term 'wax' with respect to its products, and Turtle Wax invested significant amounts of time and money in product development and advertising. . . . Had Hot Wax successfully pressed its claims in a timely manner, Turtle Wax certainly could have invested its time and money in other areas or simply renamed its products. Accordingly, in light of the extreme length of the unreasonable delay by Hot Wax, we conclude that the district court did not err in concluding that Turtle Wax was prejudiced by this delay." (*Id.* at p. 824, fn. omitted.)

The court reached a similar conclusion in *Jarrow Formulas, supra,* 304 F.3d 829. There, a supplier of nutritional supplements waited seven years to sue a competitor for allegedly making false claims about its product, PB8. (*Id.* at pp. 832–833.) The trial court granted the defendant's motion for summary judgment, concluding that the plaintiff's claims were barred by laches as a matter of law. (*Id.* at p. 833.) The Ninth Circuit affirmed. It concluded that the defendants had demonstrated prejudice as a matter of law: "Nutrition Now has invested enormous resources in tying PB8's identity to the challenged claims. After waiting for several years, Jarrow now seeks to compel Nutrition Now to abandon its presentation of PB8, forcing it to adopt a materially different characterization of its product. If Jarrow had filed suit sooner, Nutrition Now could have invested its resources in shaping an alternative identity for PB8 in the minds of the public. [Citations.]" (*Id.* at p. 839; see also *Conopco, Inc. v. Campbell Soup Co.* (2d Cir. 1996) 95 F.3d 187, 192–193 [finding prejudice because defendant could have chosen an alternative marketing position if the plaintiff had filed suit earlier].)

In the present case, the trial court found the evidence undisputed that defendants were prejudiced by plaintiffs' 10-year delay in bringing suit. We agree. The undisputed evidence establishes that plaintiffs did not allege that

the Cut-N-Seal infringed plaintiffs' trade dress rights until they filed the present suit in 2003. Between 1993 and 2003, Pampered Chef invested significant resources in developing and selling the Cut-N-Seal, which included traveling to Taiwan, producing millions of Cut-N-Seals, developing the three and a half-inch version of the product, creating recipes, printing catalogs, and promoting the product. As in *Hot Wax* and *Jarrow Formulas*, had plaintiffs pressed their claims in a timely manner, Pampered Chef could have invested its resources in other areas or altered the Cut-N-Seal in a way that would have avoided the present suit. Thus, we agree with the trial court that the evidence is undisputed that Pampered Chef was prejudiced by plaintiffs' lengthy delay in bringing suit.

Plaintiffs urge that under *California Western School of Law v. California Western University* (1981) 125 Cal.App.3d 1002, 1007 [178 Cal.Rptr. 685], defendants' expenditures on the Cut-N-Seal after they knew of plaintiffs' claim do not constitute prejudice because " '[i]f the defendant continues his act, after due warning, he does so at his own risk.' " Thus, plaintiffs suggest, because Pampered Chef "was put on notice as early as July 15, 1993 that [plaintiffs] considered the knockoff Cut-N-Seal product to be violative of its rights," their costs associated with manufacturing and selling the product after that date are not evidence of prejudice. The contention is unpersuasive. Plaintiffs do not identify any evidence that plaintiffs advised defendants of their trade dress claim in July 1993; Kaiser's July 15, 1993 letter to Doris Christopher, on which plaintiffs rely, asserted at most that Pampered Chef's sale of the Cut-N-Seal and other products constituted *patent* infringement. Indeed, the undisputed evidence at trial was that the first time plaintiffs asserted a trade dress infringement claim was when they filed the present suit in January 2003. Thus, even if *California Western* articulates the applicable law, it does not suggest a triable issue of fact as to prejudice.

Plaintiffs also urge that *Grand Canyon Trust v. Tucson Elec. Power Co.* (9th Cir. 2004) 391 F.3d 979 supports the proposition that there was no prejudicial reliance in the present case, but again we do not agree.[4] There, the defendants built a coal-powered electric generating plant without receiving a proper permit. (391 F.3d at p. 982.) Twenty-four years later, the Grand Canyon Trust sued to enforce the federal Clean Air Act. (*Ibid.*) Reversing the district court, the Ninth Circuit held that laches did not bar the suit because the defendant had not taken any action in reliance on the plaintiff's delay. To the contrary, the court concluded that "Grand Canyon's delay worked to the benefit of Tucson Electric because it allowed Tucson Electric the opportunity

---

[4] This version of the opinion amended and superseded the earlier version cited by plaintiffs, which was published at *Grand Canyon Trust v. Tucson Elec. Power Co.* (2004) 382 F.3d 1016.

to recover some or all of its investment in Springerville Units 1 and 2 before this suit was filed. By contrast, if Grand Canyon had brought this action immediately after construction on each Unit was completed, and had the court held that Tucson Electric was required to replace the equipment it had just installed, Tucson Electric's loss would have been total." (*Id.* at pp. 988–989.)

The present case differs in significant respects. In contrast to *Grand Canyon Trust*, where the defendant apparently did not expend additional resources in the plant as a result of plaintiff's delay, here defendants produced millions of Cut-N-Seals as a direct result of plaintiffs' delay. Further, in 2000, defendants developed, and subsequently produced and marketed, a new three and a half-inch version of the product. Thus, plaintiffs' assertion that "[Pampered Chef] and [Good Things] simply did nothing to change their course of action in reliance upon [Kitchen Connection's] not filing trade dress claims until January 2003" is not supported by the evidence. And, while in *Grand Canyon Trust* the delay worked to the defendant's benefit because it allowed the defendant to recoup some of its *prior* investment in the power plants, here the delay had the opposite effect because it resulted in defendants' *continued* investment in the Cut-N-Seal.

We also reject plaintiffs' suggestion that defendants "failed to identify any specific evidence of incremental costs attributable to the Cut-N-Seal." As the trial court noted, the evidence of Pampered Chef's investment in the Cut-N-Seal was undisputed. Further, as the trial court also found, while Pampered Chef could not specifically quantify the costs of developing and marketing the Cut-N-Seal, Pampered Chef did quantify its production costs. The undisputed evidence was that Pampered Chef paid $1.40 to $1.70 per unit for the three-inch and four-inch Cut-N-Seals, and approximately $1.45 per unit for the three and a half-inch Cut-N-Seals. Between 1993 and 2003, Pampered Chef sold hundreds of thousands of Cut-N-Seals, representing an investment of millions of dollars in the product. Had the present suit been brought earlier, Pampered Chef could have invested these sums in other products.

 Finally, we dismiss as waived plaintiffs' contention that the trial court's exclusion of testimony and documents relevant to the issue of prejudice was reversible error. Plaintiffs claim that they would have been able to rebut defendants' evidence of prejudice had they been permitted to introduce the testimony of financial experts Stan Smith and Michael Mische, as well as "various financial records of [Pampered Chef] relevant to the issue of lack of prejudice," including "certain financial documents produced via verified document request responses." However, plaintiffs have not demonstrated that they made an offer of proof at trial, nor have they given this court

any information about the substance of the documents or testimony that would allow us to conclude that their exclusion was erroneous. " 'It is the burden of the proponent of evidence to establish its relevance through an offer of proof or otherwise,' and a specific offer of proof is necessary in order to preserve an evidentiary ruling for appeal. [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1332 [29 Cal.Rptr.3d 286].) Because plaintiffs apparently failed to make an offer of proof, the issue was not preserved for appeal.

### 4. Unclean Hands

Plaintiffs contend that even if laches otherwise would bar their claims, defendants cannot assert it because they have unclean hands. Specifically, plaintiffs assert that defendants (1) intentionally copied the Tartmaster's design; (2) falsely marked the three and a half-inch Cut-N-Seal "pat. pending," and (3) omitted Kaiser's prior use of the phrase "cut 'n seal" from their trademark application.

 Plaintiff is correct that in appropriate cases, unclean hands has been held to bar a laches defense to Lanham Act claims. Specifically, as applied to infringement claims under the Lanham Act, unclean hands has been held to bar the assertion of laches by a "willful" or "deliberate" infringer. (E.g., *Danjaq LLC, supra,* 263 F.3d at pp. 956–957; *Hermès Intern. v. Lederer de Paris Fifth Ave.* (2d Cir. 2000) 219 F.3d 104, 107.)[5] However, while the willfulness exception has been held to apply where a defendant intentionally *infringed* on another's rights, it does not extend, as plaintiffs suggest, to mere intentional *copying.* Rather, " '[t]o establish willful infringement, a plaintiff must prove by clear and convincing evidence that the defendant acted without a reasonable belief that its action avoided infringement.' " (*State Contracting & Engineering Corp. v. Condotte America, Inc.* (Fed.Cir. 2003) 346 F.3d 1057, 1063, quoting *Crystal Semiconductor v. TriTech Microelectronics* (Fed.Cir. 2001) 246 F.3d 1336, 1351; see also *Danjaq LLC, supra,* 263 F.3d at p. 957 ["for purposes of the willfulness exception to laches, . . . the term 'willful'

---

[5] According to the Ninth Circuit, this principle "appears to be based on the equitable maxim that 'he who comes into equity must come with clean hands,' *Hermès Intern. v. Lederer de Paris Fifth Ave.* 219 F.3d 104, 107 (2d Cir. 2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 [89 L.Ed. 1381, 65 S.Ct. 993] (1945)), and entered the legal landscape in the form of a musing by Judge Learned Hand, as a caveat to his famous articulation of the laches doctrine . . . : 'It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win. *If the defendant be a deliberate pirate, this consideration might be irrelevant* . . . .' " (*Danjaq LLC, supra,* 263 F.3d at pp. 956–957, quoting *Haas v. Leo Feist, Inc.* (S.D.N.Y. 1916) 234 F. 105, 108.)

refers to conduct that occurs 'with knowledge that the defendant's conduct constitutes . . . infringement' "]; *Jarrow Formulas, supra*, 304 F.3d at p. 842, italics added ["A plaintiff can escape laches under the unclean hands doctrine only if the court is left with a firm conviction that the defendant acted *with a fraudulent intent* in making the challenged claims"]; *Hermès Intern. v. Lederer de Paris Fifth Ave., supra*, 219 F.3d at p. 107, italics added ["It is well established that 'laches is not a defense against injunctive relief when the defendant intended *the infringement* "]; *Hall v. Aqua Queen Mfg., Inc.* (Fed.Cir. 1996) 93 F.3d 1548, 1555 ["The test of willful infringement is 'whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed' "].) In other words, to come within the "willfulness" exception, the defendant must know not only that its product mimics another, but that its mimicking of that product constitutes trade dress infringement.

Here, plaintiffs have not cited any evidence that defendants intentionally infringed on plaintiffs' trade dress. Plaintiffs are correct that defendants "admitted that they intentionally copied the exterior design of the Tartmaster" and "the same catalog number was used," but that is not sufficient to demonstrate willful trade dress infringement. Rather, as we have noted, plaintiffs must demonstrate that defendants both (1) intentionally copied their trade dress *and* (2) did so with knowledge that the copying constituted trade dress infringement. Because plaintiffs have not identified any evidence that would support the second element (i.e., knowledge of infringement), we conclude that the trial court properly found no triable issues of fact as to willfulness.

 Plaintiffs also assert that defendants had unclean hands because they erroneously stamped the three and a half-inch Cut-N-Seal "pat. pending" and filed a trademark registration for the name "Cut-N-Seal" without disclosing that the phrase "Cut 'N Seal" appeared on the back cover of Kaiser's cookbook Pasta, Pies and Pastries. The trial court correctly concluded that these assertions, even if correct, would not defeat defendants' laches defense. "The unclean hands doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith *relative to the matter in which he seeks relief.*' " (*Jarrow Formulas, supra*, 304 F.3d at p. 841, quoting *Precision Co. v. Automotive Co., supra*, 324 U.S. at p. 814.) In other words, " 'misconduct in the abstract, unrelated to the claim to which it is asserted as a defense,' " does not bar a laches defense. (*Jarrow Formulas, supra*, 304 F.3d at p. 841, quoting *Republic Molding Corp. v. B. W. Photo Utils.* (9th Cir. 1963) 319 F.2d 347, 349.) "What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." (*Republic Molding Corp. v. B. W. Photo Utils., supra*, 319 F.2d at p. 349.)

Here, plaintiffs have not suggested any way in which defendants acquired any rights relevant to plaintiffs' trade dress infringement claim through the alleged misuse of the "pat. pending" designation or use of the "Cut-N-Seal" trade name. This case thus resembles others in which courts rejected claims of unclean hands because although the alleged misconduct concerned the *product* as to which rights were asserted, it did not concern the *rights* to those products that were the subject of litigation. (See, e.g., *Tveter v. AB Turn-O-Matic* (9th Cir. 1980) 633 F.2d 831, 839 [unclean hands doctrine did not bar judicial enforcement of plaintiff's trademark rights in ticket dispenser, notwithstanding defendant's contention that plaintiff had falsely marked dispenser "patent pending": "No relationship is suggested between appellees' asserted misuse and the acquisition of appellees' trademark rights; no other reason, arising out of the misuse, is advanced that would make it inequitable to enforce those rights"]; *Republic Molding Corp. v. B. W. Photo Utils., supra*, 319 F.2d at pp. 348–351 [unclean hands doctrine did not bar plaintiff's patent infringement and unfair competition claims where the conduct found to constitute unclean hands—marking product "patent pending." although no patent had been sought—was unconnected to defendant's misconduct].)[6]

For all these reasons, we conclude that the trial court properly granted a directed verdict as to the third and fourth causes of action for trade dress infringement.

C. *Eighth Cause of Action: Unjust Enrichment*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II., III.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] Plaintiffs also assert that the trial court erroneously excluded evidence that Pampered Chef assigned the Cut-N-Seal trademark to Berkshire Hathaway, Inc., which in turn assigned it to Columbia Insurance Co. Neither the trial record nor plaintiffs' appellate briefs suggest why this evidence was relevant to plaintiffs' case, and thus we cannot conclude that its exclusion was an abuse of discretion. (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885 [57 Cal.Rptr.3d 454] [trial court's decision to admit or exclude evidence under the abuse of discretion standard]; *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802] [same].) Moreover, even if the exclusion were erroneous, it would be grounds for reversal only if there is a reasonable probability that a result more favorable to plaintiffs would have been reached in the absence of the error. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 815 [50 Cal.Rptr.3d 731], citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Plaintiffs have not made such a showing.

[*]See footnote, *ante*, page 1144.

## DISPOSITION

For the foregoing reasons, we (1) affirm the judgment for defendants, and (2) affirm the order denying Good Things International and Ten Mark Corporation's motions for attorney fees. Defendants shall recover their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied August 20, 2007.