**GRAND CANYON TRUST, Plaintiff–Appellant,**

v.

**TUCSON ELECTRIC POWER COMPANY, Defendant–Appellee.**

No. 03–15584.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 2004.

Filed Sept. 2, 2004.

Amended Dec. 8, 2004.

Reed Zars, Laramie, WY, for the plaintiff-appellant.

Henry V. Nickel, Hunton & Williams, Washington, D.C., for the defendant-appellee.

Before: T.G. NELSON, W. FLETCHER, and BERZON, Circuit Judges.

## ORDER AND AMENDED OPINION

### ORDER

1. On Slip Op. 12691, in between the carryover paragraph (which ends with "relatively lax pollution rules.") and the first full paragraph (which begins with "Tucson Electric was well aware . . ."), the following paragraph is inserted:

Specifically, the 1978 Regulations provided:

> Approval to construct *shall* become invalid if construction is not commenced within 18 months after the receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18–month time period upon a satisfactory showing that an extension is justified.

40 C.F.R. § 52.21(s)(2) (1978) (emphasis added).[1] Like the district court, we read this language to provide that a permit automatically becomes invalid in the enumerated circumstances unless the administrator exercises discretionary authority to extend the permit. On a natural reading of the language, administrative action is only required to forestall invalidation of a permit. No agency action is required to invalidate a permit if construction is not timely commenced. *See Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1034, 1037 (1st Cir.1982) (stating that a permit "automatically expires" under 40

C.F.R. § 52.21(s)(2) if construction. does not commence with 18 months of issuance).

1. The 1975 Regulations, which were in effect at the time the permit was issued, are, in all respects relevant to this case, the same as the 1978 Regulations. They provided that "[a]pproval to construct or modify *shall* become invalid if construction or expansion is not commenced within 18 months after receipt of such approval or if construction is discontinued for a period of 18 months or more. The Administrator may extend such time period upon a satisfactory showing that an extension is justified." 40 C.F.R. § 52.21(e)(3) (1975) (emphasis added).

2. On Slip Op. 12700 at line 2, "the opportunity" is inserted between "allowed Tucson Electric . . ." and "to recover some or all. . . ." The full sentence now reads: "Rather, it appears that Grand Canyon's delay worked to the benefit of Tucson Electric because it allowed Tucson Electric the opportunity to recover some or all of its investment in Springerville Units 1 and 2 before this suit was filed."

With these changes, the panel votes to deny the petition for rehearing. Judges W. Fletcher and Berzon vote to deny the petition for rehearing en banc; and Judge T.G. Nelson so recommends.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for rehearing en banc, filed September 23, 2004, are DENIED. No subsequent petitions for panel or en banc rehearing will be entertained.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

In December 1977, Tucson Electric Power Company received a permit from the Environmental Protection Agency ("EPA") to build a coal-powered electric generating plant near the town of Springerville, Arizona (the "Springerville plant," or "Spring-

erville"). Twenty-four years later, the Grand Canyon Trust ("Grand Canyon") brought this action against Tucson Electric to enforce the federal Clean Air Act. Grand Canyon alleges that Tucson Electric's 1977 construction permit for Springerville was invalid for several related reasons and, therefore, that Tucson Electric has been operating Springerville for many years in violation of the Clean Air Act. The district court granted partial summary judgment to Tucson Electric on the merits of one of Grand Canyon's claims, and subsequently granted summary judgment to Tucson Electric on the entire action based on the equitable defense of laches.

Grand Canyon appeals both orders. Tucson Electric has moved to strike Grand Canyon's appeal of the partial summary judgment order. We deny Tucson Electric's motion to strike, we vacate the order granting partial summary judgment, we reverse the judgment dismissing the entire action based on laches, and we remand for further proceedings.

## I. Background

Founded in 1985, Grand Canyon is a non-profit environmental organization dedicated to conserving the natural resources of the "Colorado Plateau." The Colorado Plateau is not actually a plateau, but rather an enormous high basin centered roughly at the "four corners" where Colorado, Utah, Arizona, and New Mexico meet. The Plateau is filled with plateaus, canyons, buttes, mesas, natural arches and other geological features. It contains over twenty National Parks, National Monuments, National Landmarks, and National Recreation Areas. Grand Canyon, Bryce Canyon, and Zion National Parks are all within the Plateau.

Tucson Electric is an electric utility company that serves the Tucson, Arizona,

area. It is the sole owner and operator of the Springerville plant, located within the Colorado Plateau. Grand Canyon asserts that Springerville is an antiquated power plant that produces a large amount of pollution, thereby harming the air quality in the Colorado Plateau. Grand Canyon also asserts that Springerville's emissions would be significantly reduced if it were upgraded and operated using current technology.

In December 1977, as it was required to do by the Clean Air Act and EPA regulations then in effect, Tucson Electric applied to the EPA for a permit to construct the Springerville plant. The resulting permit (the "1977 Permit") authorized the construction of two 350–megawatt coal-fired steam electric generating units ("Units 1 and 2"). At about this time, Congress amended the Clean Air Act. Among other things, the amendments required that all new sources of air pollution use the most current, state-of-the-art pollution controls. This requirement is known as the "best available control technology" ("BACT") requirement. 40 U.S.C. § 52.21(b)(10) (1978) (now codified at 42 U.S.C. § 7475(a)(4)).

In June 1978, the EPA incorporated the BACT requirement into its regulations (the "1978 Regulations"), but "grandfathered" permits that had already been issued, such as the 1977 Permit for Springerville. The 1978 Regulations provided that already-existing permits would remain valid—and therefore not subject to the BACT requirement—if construction commenced by March 19, 1979. 40 C.F.R. § 52.21(i)(2)(ii) (1978). If, however, construction commenced after that date, the old permit would no longer be valid, and a new one—subject to the BACT requirement—would have to be obtained. *Id.* §§ 52.21(i)(2), (j)(2). The 1978 Regulations provided that discontinuing construction for a period of more than eighteen months, or failing to complete construction within a "reasonable" amount of time, had the same effect as failing to commence construction by March 19, 1979. *Id.* § 52.21(i)(2)(iii). The apparent purpose of the regulations was to preserve settled expectations with respect to already-issued permits, while at the same time to prevent anyone from stock-piling construction permits previously granted under the former, relatively lax pollution rules.

Specifically, the 1978 Regulations provided:

> Approval to construct *shall* become invalid if construction is not commenced within 18 months after the receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18–month time period upon a satisfactory showing that an extension is justified.

40 C.F.R. § 52.21(s)(2) (1978) (emphasis added).[1] Like the district court, we read this language to provide that a permit automatically becomes invalid in the enumerated circumstances unless the administrator exercises discretionary authority to extend the permit. On a natural reading of the language, administrative action is only required to forestall invalidation of a

---

1. The 1975 Regulations, which were in effect at the time the permit was issued, are, in all respects relevant to this case, the same as the 1978 Regulations. They provided that "[a]pproval to construct or modify *shall* become invalid if construction or expansion is not commenced within 18 months after receipt of such approval or if construction is discontinued for a period of 18 months or more. The Administrator may extend such time period upon a satisfactory showing that an extension is justified." 40 C.F.R. § 52.21(e)(3) (1975) (emphasis added).

permit. No agency action is required to invalidate a permit if construction is not timely commenced. *See Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1034, 1037 (1st Cir.1982) (stating that a permit "automatically expires" under 40 C.F.R. § 52.21(s)(2) if construction does not commence with 18 months of issuance).

Tucson Electric was well aware of the importance of "commencing construction" on Springerville by March 19, 1979. A February 1978 letter from Tucson Electric to the EPA asserted that it had "commenced construction" on Springerville on January 30, 1978, because it had entered into a contract for construction of the boilers for Springerville Units 1 and 2 on that date. In another letter to the EPA dated March 14, 1979—just five days before the grandfathering deadline—Tucson Electric listed "the main activities" underway with respect to the construction of Springerville. It is undisputed that Tucson Electric completed construction of Springerville Units 1 and 2 in 1985 and 1990, respectively, and that the Units have operated ever since.

In spring 2001, Tucson Electric publicly announced a plan (the "Netting Plan") to construct two new coal-fired units at Springerville ("Units 3 and 4"). Under the Netting Plan, Tucson Electric sought to avoid the extensive review the EPA applies to new sources and major modifications. Under the plan, the EPA would not analyze Units 3 and 4 as free-standing units. Instead, the EPA would analyze Units 3 and 4 as part of the existing Springerville plant, merely ensuring that the plant as a whole would have no net increase in emissions once Units 3 and 4 were added. For various reasons, including the fact that Units 3 and 4 were to be the first new coal-fired units on the Colorado Plateau in a decade, Tucson Electric's announcement caught the attention of both Grand Canyon and the EPA. Prior to this time, Grand Canyon had not shown any particular interest in Tucson Electric's 1977 Permit for Springerville despite the fact that one member of the Grand Canyon board of trustees since 1986 was also a member of the board of Tucson Electric from 1983 to 1991.

Grand Canyon and the EPA both undertook independent investigations of Springerville. Grand Canyon concluded the obvious—that Units 1 and 2 of Springerville were not fitted with the BACT and were therefore discharging much more pollution than newer power plants. Springerville, of course, was not required to comply with the BACT requirement, so long as the 1977 Permit was valid and was grandfathered under the 1978 Regulations. Thus, Grand Canyon began investigating the validity of the 1977 Permit. As discussed above, the Permit's validity depended on the date on which Tucson Electric commenced construction on Springerville Units 1 and 2, and the diligence and speed with which it continued that construction. *See* 40 C.F.R. § 52.21 (1978) (providing for the automatic cancellation of already-issued construction permits if, *inter alia*, construction does not commence by March 19, 1979).

Based on its investigation, Grand Canyon contends that the 1977 Permit was invalid. It brought this citizen enforcement action under the Clean Air Act claiming that Tucson Electric did not commence construction of Springerville by the cut-off date of March 19, 1979; that it discontinued construction for one or more periods of longer than eighteen months; and that it did not complete construction within a reasonable time. If any of these claims is proved, the necessary implication is that the 1977 Permit was rendered invalid by operation of the 1978 Regulations, *see id.* §§ 52.21(i)(1), (i)(2), and that Tucson Elec-

tric therefore built Springerville Units 1 and 2 without a valid construction permit. Unauthorized construction of a power plant violates the Clean Air Act and provides grounds for a citizen suit under the Act's citizen suit provision. *See* 42 U.S.C. § 7604(a)(3) (empowering citizens to bring suit for injunctive relief and civil penalties "against any person who ... constructs any new or modified major emitting facility without a [valid] permit").

Tucson Electric challenged the jurisdiction of the district court and defended itself on the merits. As to jurisdiction, Tucson Electric asserted that the validity of the 1977 Permit was an issue over which the EPA has exclusive jurisdiction. By statute, any final action of the EPA may only be reviewed in the courts of appeals. 42 U.S.C. § 7607(b). The district court found that it had jurisdiction over the action. On the merits, Tucson Electric asserted that no genuine issue of material fact existed regarding the commencement of construction before March 19, 1979 and moved for partial summary judgment. The district court concluded that Tucson Electric had "commenced construction" in 1978—before the deadline—by drilling wells at the Springerville site. The court therefore granted partial summary judgment in September 2002 to Tucson Electric.

Meanwhile, the EPA had conducted its own investigation and reached its own conclusion regarding the validity of the 1977 Permit. Unbeknownst to the district court, the EPA had sent a letter in February 2002 to the Arizona Department of Environmental Quality in which the EPA formally objected to Tucson Electric's Netting Plan (the "EPA Objection"). In its Objection, the EPA opined that, based on

its investigation, Tucson Electric had not commenced construction on Springerville by March 19, 1979, and hence was operating the plant without a valid permit in violation of the Clean Air Act:

> [Tucson Electric] failed to commence construction on Units 1 and 2 at the Springerville Generating Station by March 19, 1979, as required by the 1978 [Regulations], and hence was not grandfathered out of the need to obtain a[new permit that would impose the BACT requirement.] ... As a result, *Units 1 and 2 were constructed and are operating without a valid [ ] permit, in violation of the ... [Clean Air Act]*. Therefore, [we reject Tucson Electric's Netting Plan for Units 3 and 4].

(Emphasis supplied.) The EPA's conclusion is obviously directly contrary to that of the district court, but the EPA Objection was not presented to the court until February 2003, several months after the court had granted partial summary judgment to Tucson Electric on the question of whether Tucson Electric "commenced construction" in time to be grandfathered. We were told at oral argument by Tucson Electric that the EPA Objection has since been withdrawn,[2] but there is nothing in the record now before us to this effect.

Tucson Electric subsequently brought another motion for summary judgment, this time arguing that the equitable doctrine of laches—defined as unexcused delay by plaintiff resulting in prejudice to defendant—barred Grand Canyon's suit in its entirety. The district court granted Tucson Electric's motion and dismissed the entire action. Grand Canyon appeals from both of the district court's conclusions, *i.e.*, that Tucson Electric

---

**2.** The tape recorder malfunctioned at oral argument, so we are unable to reconstruct precisely what Tucson Electric said. Our best

recollection is that we were informed that the EPA Objection was "withdrawn."

"commenced construction" of Springerville before March 19, 1979, and that Grand Canyon's entire action is barred by laches. Upon receiving Grand Canyon's opening brief to this court, Tucson Electric moved to strike the portion that addressed the issue of when it commenced construction on the ground that the district court's grant of partial summary judgment on this issue was an unappealable interlocutory order.

## II. Discussion

### A. District Court Jurisdiction

As a preliminary matter, Tucson Electric asserts that the district court lacked subject matter jurisdiction over the action. Tucson Electric observes that the exclusive vehicle for judicial review of final decisions of the EPA regarding the Clean Air Act is an appeal to one of the federal courts of appeals, not an original action in district court. 42 U.S.C. § 7607(b). According to Tucson Electric, the fact that the EPA has failed to take action with respect to Springerville Units 1 and 2 means that the EPA has tacitly ruled that the 1977 Permit is valid. In bringing this action, says Tucson Electric, Grand Canyon is attempting to seek review of an EPA ruling in district court, which is prohibited by the Clean Air Act. *Id.*

■ Tucson Electric's argument fails to recognize that while a citizen's challenge to a decision of the EPA may only be brought in the courts of appeals, a citizen enforcement action against third parties for alleged violations of the Clean Air Act may be brought in the district courts. The Act states that the "district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce [ ] an emission standard or limitation." 42 U.S.C. § 7604(a). The Act also provides that a permit requirement is one type of "emission standard or limitation" that "private attorneys general" may enforce in district court. *Id.* § 7604(f)(3), (4). The district court therefore had subject matter jurisdiction over the action.

### B. Partial Summary Judgment

■ Tucson Electric argues that this court lacks subject matter jurisdiction to review the district court's partial summary judgment holding that Tucson Electric "commenced construction" of Springerville in 1978. Tucson Electric asserts that the grant of partial summary judgment on this issue was not an appealable "final decision" under 28 U.S.C. § 1291 "because it did not dispose of [Grand Canyon's] case in its entirety." It is well settled, however, that an "appeal from the final judgment draws in question all earlier non-final orders and all rulings which produced the judgment." *Munoz v. Small Bus. Admin.,* 644 F.2d 1361, 1364 (9th Cir.1981); *see Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.,* 257 F.3d 1071, 1075(9th Cir.2001) (discussing the "familiar concept[ ]" that "interlocutory orders entered prior to the judgment merge into the judgment"). Because Grand Canyon has also appealed the district court's grant of summary judgment on the basis of laches, this court has jurisdiction to review the district court's prior grant of partial summary judgment. Under our case law, we have discretion in this circumstance to decide whether and how to exercise jurisdiction over non-final interlocutory orders such as a grant of partial summary judgment. *See, e.g., Carey v. Nev. Gaming Control Bd.,* 279 F.3d 873, 877 n. 1 (9th Cir.2002) (recognizing appellate jurisdiction but declining to exercise it).

The district court made its finding that Tucson Electric commenced construction of Springerville in 1978 without the benefit of the EPA Objection, in which the

EPA put forth its view that Tucson Electric did not "commence construction ... by March 19, 1979." Because the date when construction commenced is vital to the determination of which set of regulations governs pollution-emitting sources, and because the EPA has institutional expertise on this question, the EPA Objection might have been an important factor in the district court's decision if the district court had known about it. We recognize, based on Tucson Electric's statement at oral argument, that the EPA may have abandoned the points raised in its Objection, but we are not in a position, on this record, to assess accurately the status of the Objection. In these circumstances, we exercise our authority to review the district court's order granting partial summary judgment on the "commence construction" issue, and we vacate that order. We accordingly deny Tucson Electric's motion to strike Grand Canyon's appeal of the partial summary judgment. On remand, the district court should reconsider Tucson Electric's motion for partial summary judgment in light of any evidence properly presented by the parties.

### C. Laches

■■■■ Laches is an equitable defense to a civil action. To establish laches, a defendant must establish (1) lack of diligence by the plaintiff, and (2) prejudice to the defendant. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). Laches "must be invoked sparingly in suits brought to vindicate the public interest," including Clean Air Act citizen enforcement actions. *Apache Survival Coalition v. United States,* 21 F.3d 895, 905–06 (9th Cir.1994) (internal quotation marks and citations omitted) (collecting cases). Grand Canyon goes further and argues that the district court erred in applying the laches doctrine against it at all because Grand Canyon appears here as a "private

attorney general" prosecuting a citizen enforcement suit. *See generally Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517, 1522 (9th Cir.1987) ("Citizen enforcement actions greatly resemble government enforcement and qui tam actions.... [In] suits brought to enjoin or otherwise abate ongoing violations ... citizen plaintiffs ... effectively stand in the shoes of the EPA. The citizen plaintiff's role is to assert permit violations and to request that a fine be imposed; the citizen plaintiff does not personally benefit from bringing the action.") (internal citations omitted).

Grand Canyon contends that since laches may not be invoked against the government, *e.g., United States v. Beebe,* 127 U.S. 338, 344, 8 S.Ct. 1083, 32 L.Ed. 121 (1888), laches does not apply to citizen enforcers who "stand in the shoes" of the government. *Student Pub. Interest Research Group of N.J. v. P.D. Oil & Chem. Storage, Inc.,* 627 F.Supp. 1074, 1085 (D.N.J. 1986) ("As citizen plaintiffs stand in the shoes of the government 'as private attorneys general,' it makes no sense to apply laches in a citizen suit."); *accord Natural Res. Def. Council, Inc. v. Fox,* 909 F.Supp. 153, 160 (S.D.N.Y.1995); *cf. Sierra Club,* 834 F.2d at 1521–22 (holding that, "[b]ecause citizen enforcement suits are analogous to EPA enforcement suits and qui tam actions," the statute of limitations of 28 U.S.C. § 2462, which applies to any "action, suit or proceeding for the enforcement of [a] civil fine," applies to citizen enforcement actions).

We assume, without deciding, that laches is available as a defense against a private attorney general suing under the Clean Air Act, and that, under *Apache Survival Coalition,* it must be applied "sparingly." 21 F.3d at 905–06. For the reasons that follow, however, we vacate the district court's holding that Grand Canyon's enforcement action is barred by

laches. Because we limit our review to questions of law, it is de novo.

■ We also assume, again without deciding, that Grand Canyon unduly delayed in bringing this suit. But "laches is not a doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice." *In re Beaty*, 306 F.3d 914, 924 (9th Cir.2002). A lengthy delay, even if unexcused, that does not result in prejudice does not support a laches defense.

By contrast, a brief unexcused delay that causes sufficient prejudice to the defendant is a proper ground for invocation of the doctrine. *Cf. id.* at 925 (noting that "a claim may be barred by laches even if the statute of limitations for the claim has not expired") (collecting cases).

> Courts have recognized two chief forms of prejudice in the laches context—evidentiary and expectations-based. Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died. A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir.2001) (citations omitted).

■ Tucson Electric makes no claim that its defense to this action has suffered any evidentiary-based prejudice due to Grand Canyon's delay. It does not assert that any documents have been lost, or that any witnesses are deceased or have trouble recollecting distant events. *Cf., e.g., McKnight v. Taylor*, 42 U.S. (1 How.) 161, 168, 11 L.Ed. 86 (1843) (noting that laches doctrine exists because of "the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost"); *Randolph v. Ware*, 7 U.S. (3 Cranch) 503, 513, 2 L.Ed. 512 (1806) (finding laches where plaintiff's suit was "brought forward after a sleep of near 30 years, during which period the original parties and their agents have disappeared and are no more").

All the prejudice claimed by Tucson Electric is "expectations-based." *Danjaq*, 263 F.3d at 955. The district court found that if it granted the relief sought by Grand Canyon, Tucson Electric would have to replace the originally installed emission-control equipment in Units 1 and 2, which could cost up to $300 million. The district court also found that, because Grand Canyon "is seeking civil penalties amounting to $25,000 to $27,500 per day to accrue from the date [Grand Canyon] alleges [Tucson Electric's] permit was invalid[, Grand Canyon's] delay in bringing suit has [ ] served to excessively increase those potential penalties." The district court concluded that "[t]he harms [Grand Canyon] seeks to prevent are only reversible at undue cost to the Springerville Plant project[. Tucson Electric] has therefore established it will suffer prejudice as a result of [Grand Canyon's] unreasonable delay." We disagree. We hold, as a matter of law, that neither the requirement that Tucson Electric replace its emission-control equipment, nor the potential for civil fines, establishes the type of expectations-based prejudice that laches requires.

The district court found that Tucson Electric was prejudiced because Grand Canyon allowed Tucson Electric to operate Springerville Unit 1 since 1985 and Unit 2 since 1990 before finally bringing this action in 2001. We do not see how this delay prejudiced Tucson Electric. Rather, it appears that Grand Canyon's delay worked to the benefit of Tucson Electric because it allowed Tucson Electric the opportunity to recover some or all of its investment in Springerville Units 1 and 2 before this suit was filed. By contrast, if Grand Canyon

had brought this action immediately after construction on each Unit was completed, and had the court held that Tucson Electric was required to replace the equipment it had just installed, Tucson Electric's loss would have been total. The original Units would not have operated for a single day, and Tucson Electric would not have had the opportunity to recover any part of its immense investment. But in actual fact, Grand Canyon's delay allowed Tucson Electric to operate Units 1 and 2 for many years before having to replace them. Indeed, the longer the delay in bringing the suit, the greater the benefit—not the detriment—to Tucson Electric.

The district court also found that Grand Canyon's delay would prejudice Tucson Electric by increasing its liability for civil penalties. We disagree. First, there may be a statute of limitations defense to the assessment of civil penalties. The question of the statute of limitations has not been addressed by the district court and is not before us now, so we do not decide this question of law. The district court on remand will be in a position to assess the impact of the statute of limitations in the first instance.

Second, to the degree that any civil fines might be available, consistent with the statute of limitations, would be inequitable, laches is not the most appropriate vehicle for avoiding that inequity. Federal courts are courts of equity with the flexibility to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). We believe that the appropriate time to determine whether it would be inequitable to award civil penalties will be after a resolution on the merits. If Grand Canyon prevails in the action, the district court can (and should) consider whether equity requires it to re-duce civil penalties that would otherwise be available against Tucson Electric.

Conclusion

We DENY Tucson Electric's motion to strike. We VACATE the partial summary judgment order entered on the merits. We REVERSE the final summary judgment order entered based on laches. We REMAND to the district court for further proceedings consistent with this opinion.