**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAULA PETRELLA, an individual,
          *Plaintiff-Appellant,*

v.

METRO-GOLDWYN-MAYER, INC., a
corporation; METRO-GOLDWYN-
MAYER STUDIOS, INC., a
corporation; METRO-GOLDWYN-
MAYER HOME ENTERTAINMENT,
LLC, a limited liability company;
METRO-GOLDWYN-MAYER HOME
ENTERTAINMENT DISTRIBUTION
CORPORATION, a corporation;
UNITED ARTISTS CORPORATION, a
corporation; 20TH CENTURY FOX
HOME ENTERTAINMENT, LLC, a
limited liability company,
          *Defendants-Appellees.*

No. 10-55834

D.C. No.
2:09-cv-00072-GW-
MAN

10167

PAULA PETRELLA, an individual,
            *Plaintiff-Appellee,*

            v.

METRO-GOLDWYN-MAYER, INC., a
corporation; METRO-GOLDWYN-
MAYER STUDIOS, INC., a
corporation; METRO-GOLDWYN-
MAYER HOME ENTERTAINMENT,
LLC, a limited liability company;
METRO-GOLDWYN-MAYER HOME
ENTERTAINMENT DISTRIBUTION
CORPORATION, a corporation;
UNITED ARTISTS CORPORATION, a
corporation; 20TH CENTURY FOX
HOME ENTERTAINMENT, LLC, a
limited liability company,
            *Defendants-Appellants.*

No. 10-55853

D.C. No.
2:09-cv-00072-GW-
MAN

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
February 1, 2012—Pasadena, California

Filed August 29, 2012

Before: William A. Fletcher, and Raymond C. Fisher,
Circuit Judges, and Jack Zouhary, District Judge.*

Opinion by Judge Fisher;
Concurrence by Judge W. Fletcher

---

*The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

**COUNSEL**

Glen Lance Kulik (argued), Kulik, Gottesman, Mouton & Siegel, LLP, Sherman Oaks, California, for the plaintiff-appellant.

Robert J. Catalano and David Grossman, Loeb & Loeb. LLP, Los Angeles, California; Jonathan Zavin (argued), Loeb & Loeb, New York, New York, for the defendants-appellees.

**OPINION**

FISHER, Circuit Judge:

In 2009, Paula Petrella filed an action for copyright infringement, unjust enrichment and accounting against Metro-Goldwyn-Mayer, Inc.; Metro-Goldwyn-Mayer Studios, Inc.; Metro-Goldwyn-Mayer Home Entertainment, LLC; Metro-Goldwyn-Mayer Home Entertainment Distribution Corporation; United Artists Corporation; and 20th Century Fox Home Entertainment, LLC ("the defendants"). According to Petrella, the defendants infringed her purported interest in a book and two screenplays that together allegedly formed the basis for the 1980 motion picture *Raging Bull*. The district court granted summary judgment in favor of the defendants, holding that Petrella's claims are barred by the equitable defense of laches. The district court also denied the defendants' motions for sanctions and attorney's fees. We affirm.

**BACKGROUND**

After Jake LaMotta ("LaMotta") retired from boxing, he collaborated with his long-time friend, Frank Peter Petrella ("F. Petrella"), to produce a book and two screenplays (the "1963 screenplay" and the "1973 screenplay") about LaMotta's life. Together, these works allegedly became the basis for the movie *Raging Bull*, released in 1980.

These works were registered with the United States Copyright Office. The 1963 screenplay was registered in 1963, listing F. Petrella as the claimant and sole author. According to the title page, however, it was written "in collaboration with" LaMotta. The book was registered in 1970, listing "Peter Savage" (a pseudonym of F. Petrella), LaMotta and Joseph Carter as co-authors. The 1973 screenplay was registered in 1973, listing F. Petrella as the sole author and stating 1970 as the date of publication. The copyright registration certificate noted that the work "The Raging Bull" was a "screenplay

form of the book of the same name." Despite the copyright registration dates, the parties dispute which of these three works — the 1963 screenplay, the book or the 1973 screenplay — was written first.

In a written agreement dated November 19, 1976, F. Petrella and LaMotta assigned to Chartoff-Winkler Productions, Inc., "exclusively and forever, including all periods of copyright and renewals and extensions thereof," all of their respective copyright rights in the book and "in and to those certain screenplays based on [the book] which were written in 1963 and 1973," save for a reservation of certain rights to the authors of the book. The agreement represented that the book "is original and has not been copied or adapted from any literary, dramatic or other work." It also represented that "[t]he [F. Petrella] Screenplays are original and have not been copied or adapted from any literary, dramatic or other work other than [the book]."

In about September 1978, United Artists Corporation, a wholly owned subsidiary of Metro-Goldwyn-Mayer Studios, Inc., acquired the motion picture rights to *Raging Bull* pursuant to a written assignment from Chartoff-Winkler Productions, Inc. United Artists registered a copyright in the film around September 1980. In 1981, during the original 28 year term of the copyrights for the book and the two screenplays, F. Petrella died, and his renewal rights in the works passed to his heirs.

As his daughter, Petrella now alleges she is the sole owner of the F. Petrella interest in the book and the two screenplays. In 1990, she learned of the Supreme Court's decision in *Stewart v. Abend*, and engaged an attorney to advise and assist her regarding her renewal rights.[1] The attorney filed a renewal application for the 1963 screenplay on her behalf in 1991.

---

[1]*Stewart v. Abend*, 495 U.S. 207 (1990), concerned a magazine story, "It Had to be Murder," whose author had assigned the story's motion pic-

Seven years later, in 1998, Petrella's attorney contacted the defendants, asserting that Petrella had obtained the rights to the 1963 screenplay and that the exploitation of any derivative work, including *Raging Bull*, was an infringement of these exclusive rights. Over the course of the next two years, Petrella and the defendants exchanged a series of letters in which she accused the defendants of infringing her copyrights and the defendants insisted they were not, citing two grounds. First, they claimed the 1963 screenplay was a collaboration between F. Petrella and LaMotta, so the defendants retained all necessary rights in the script under their agreement with LaMotta. Second, they denied there was any substantial similarity of protectable elements between the 1963 screenplay and the film. Petrella repeatedly threatened to take legal action, but she did not do so at that time. The final letter in this series was dated April 5, 2000. Petrella did not initiate this lawsuit until nine years later, in 2009.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment on a copyright infringement claim. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). "We must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly

---

ture rights in 1945. *Id.* at 211. Nine years later a production company along with Paramount Pictures produced and distributed the Alfred Hitchcock murder mystery, *Rear Window*. *See id.* at 212. Much later, the holder of the renewal copyright in "It Had to be Murder" brought an infringement action in 1974 against those who held the rights in *Rear Window*, which had been made from the story during its original copyright term. *See id.* at 212-13. The Court held that when an author dies before a renewal period begins, his statutory successors are entitled to renewal rights, even when the author has previously assigned the rights to another party. *See id.* at 219. The owner of a derivative work does not retain the right to exploit that work when the death of the author causes the renewal rights in the preexisting work to revert to the statutory successors. *See id.* at 220-21.

applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

Whether a plaintiff's conduct constitutes laches in any given circumstance is an issue of fact. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.06[B] (2011). The standard of review is subject to dispute. *See id.* We addressed this standard in *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001):

> As for the application of the laches defense itself, we have previously noted a seeming intracircuit conflict regarding the appropriate standard of review. *See Telink, Inc. v. United States*, 24 F.3d 42, 47 & nn.10-11 (9th Cir. 1994) (reviewing for abuse of discretion, but noting an intracircuit conflict between the abuse of discretion and clearly erroneous standards). Leaving aside the fact that this conflict may be more apparent than real, *see id.* at 47 n.11; *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 940-41 (7th Cir. 1984) (Posner, J., concurring), we need not resolve it here, for we conclude that the district court's ruling on laches must stand regardless whether it is reviewed for abuse of discretion or for clear error.

*Danjaq*, 263 F.3d at 952. The same is true here. The district court did not err under either standard of review.

We review a district court's imposition of sanctions for abuse of discretion, and its findings of fact for clear error. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1126-27 (9th Cir. 2002). We also review an order on attorney's fees under the Copyright Act for abuse of discretion, and any findings of fact underlying the fee determination for clear error. *See Smith v. Jackson*, 84 F.3d 1213, 1221 (9th Cir. 1996).

## Discussion

The district court granted summary judgment in favor of the defendants on Petrella's copyright, accounting and unjust enrichment claims. The court also denied the defendants' motions for sanctions and attorney's fees. We affirm.

## I. Copyright Infringement

[1] The district court held that Petrella's copyright infringement claim is barred by the doctrine of laches. We agree. "Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq*, 263 F.3d at 950-51 (internal quotation marks omitted). "[I]f any part of the alleged wrongful conduct occurred outside of the limitations period, courts presume that the plaintiff's claims are barred by laches." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). The statute of limitations for copyright claims in civil cases is three years. *See* 17 U.S.C. § 507(b); *see also* 3 Nimmer § 12.05[A].

The underlying elements of a laches defense are factual determinations. A defendant must prove that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice. *See Danjaq*, 263 F.3d at 951. The defendants have established that no genuine issue of material fact exists as to these three elements.[2]

---

[2]Petrella appeals the district court's rulings on the defendants' evidentiary objections to the declarations of Petrella, her expert and her attorney. We hold that the district court did not abuse its discretion by finding that "[m]uch of [the expert's] Declaration lack[ed] foundation and [was] irrelevant" and that the attorney's declaration lacked foundation. With respect to the district court's rulings on Petrella's declaration, even were we to admit the excluded evidence, laches would still apply. We therefore affirm the district court's evidentiary rulings. *See Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1333 (9th Cir. 1985) (evidentiary errors will not be reversed absent some resulting prejudice).

### 1. Delay

**[2]** "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense." *Id.* at 952. As the district court found, it is "[u]ndisputed [Petrella] was aware of her potential claims (as was MGM) since 1991," when her attorney filed her renewal application for the 1963 screenplay. She did not file her lawsuit until 18 years later, in January 2009.

### 2. Reasonableness of the Delay

**[3]** "In determining reasonableness, courts look to the cause of the delay. Delay has been held permissible, among other reasons, when it is necessitated by the exhaustion of remedies through the administrative process; when it is used to evaluate and prepare a complicated claim; and when its purpose is to determine whether the scope of proposed infringement will justify the cost of litigation." *Id.* at 954 (citations and internal quotation marks omitted). In contrast, delay is unreasonable "when its purpose is to capitalize on the value of the alleged infringer's labor, by determining whether the infringing conduct will be profitable." *Id.*

There are two relevant periods of delay in this case. The first was from 1990 (when Petrella learned of the *Stewart v. Abend* decision and engaged an attorney to advise and assist her regarding her renewal rights in the subject works) to September 1998 (when Petrella's attorney contacted the defendants concerning their exploitation of the film). Petrella testified that she did not contact the defendants and make them aware of any claims during this eight year period because "the film was deeply in debt and in the red and would probably never recoup" and she "did not know there was a time limit to making such claims."

The second period of delay began in September 1998, when Petrella's attorney sent the first of a series of letters to the defendants giving "formal notice" of her claims and threatening litigation. Although the final letter in this series was dated April 5, 2000, Petrella did not file the complaint in this case until January 2009. Petrella contends that she delayed filing the lawsuit until 2009 for several reasons, including (1) her brother's disability and her mother's illnesses that over a period of years required her attention and care; (2) her mother's fear of retaliation from the defendants; and (3) her family's inability to afford a lawsuit. She argues that these factors, combined with the defendants' affirmative conduct in telling her the film's financial position was hopeless, caused the delay.

**[4]** These explanations are unsupported by evidence other than Petrella's own declaration, and in any event, they are insufficient to demonstrate that the filing delay was reasonable. There is no explanation as to why or how Petrella's brother's disability and her mother's illnesses had any impact on her failure to file this lawsuit from 1990 until 2009, a period during which she was consulting with attorneys, renewing the copyright and sending letters to the defendants threatening a lawsuit. Petrella's excuse that she delayed because her family could not afford a lawsuit, even if true, does not make the delay reasonable. Such a "consideration appears generally to be invalid." *Danjaq*, 263 F.3d at 954-55. More importantly, the evidence suggests the true cause of Petrella's delay was, as she admits, that "the film hadn't made money" during this time period. A delay "to determine whether the scope of proposed infringement will justify the cost of litigation" may be reasonable; but delay for the purpose of capitalizing "on the value of the alleged infringer's labor, by determining whether the infringing conduct will be profitable" is not. *Id*. at 954 (internal quotation marks omitted). The district court did not err in finding Petrella's delays in notification and in filing suit — 19 years, combined — were unreasonable.

### 3. *Prejudice*

**[5]** Laches also requires a showing that a defendant was prejudiced by the plaintiff's unreasonable delay. In evaluating this element, "[i]f only a short period of time has elapsed since the accrual of the claim, the magnitude of the prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required." *Miller*, 454 F.3d at 1000 (alteration and internal quotation marks omitted).

The two primary forms of prejudice in the laches context are *expectations-based prejudice*, which exists where a defendant "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly;" and *evidentiary prejudice*, which exists where there are "such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq*, 263 F.3d at 955 (citations omitted). We conclude that expectations-based prejudice exists here, so we need not consider evidentiary prejudice.

**[6]** A defendant establishes expectations-based prejudice if it shows that "during the delay, it invested money to expand its business or entered into business transactions based on [its] presumed rights." *Miller*, 454 F.3d at 999. Specifically, there is prejudice where, "as a result of entering into such business transactions during the delay, it may incur liability for damages." *Id*. at 1000. Prejudice can also result from the "coming into existence of business plans and relationships based on reliance on the state of affairs challenged by the claims of the litigation." Howard B. Abrams, *Law of Copyright* § 13:48 (2011).

**[7]** The defendants have established such prejudice here. Edward J. Slizewski, Senior Vice President for Participations & Residuals for Metro-Goldwyn-Mayer Studios, Inc., stated that, since Petrella learned of the allegedly infringing conduct in 1991, the defendants "distributed the Film on a continuous

basis in the United States and abroad, and . . . expended substantial financial and other resources as a part of this effort," including "costs relating to marketing, advertising, distributing and otherwise promoting the Film in various media."[3] He calculated that these costs totaled nearly $8.5 million in the United States alone. The defendants did not break out these expenditures into specific time periods, so we cannot identify and quantify those that were incurred before Petrella notified the defendants of her copyright claim in 1998. But it is clear that they incurred significant investments in promoting the film after several years elapsed following the end of the parties' exchange of letters in April 2000 without Petrella taking any action to carry out her threat of litigation.

For instance, in 2004 and 2005, the defendants "spent approximately $3 million to create, promote and distribute a 25th Anniversary Edition of the Film that was released in 2005." In 2008 and 2009, they "incurred more than $100,000 in costs to convert Raging Bull to the Blu-Ray format, and to promote, market and distribute the Film in that medium." Slizewski explained that "[t]hese activities and expenditures were made based on the understanding and belief that the [defendants] have complete ownership and control of the Film. . . . Had Ms. Petrella filed suit in 1991 (or 1998), the [defendants] would have had an opportunity to litigate this claim prior to making these various and significant investments in the Film. Because no such suit was filed prior to 2009, the [defendants] were deprived of this opportunity."

In addition to these investments, Slizewski stated that the defendants had, since 1991, "entered into numerous agreements to license the Film, including various agreements in which television networks . . . are authorized to broadcast the Film through 2015. License agreements relating to future dis-

---

[3]Petrella objected to Slizewski's declaration, arguing that it contradicted his deposition testimony. The district court did not abuse its discretion in overruling the objection.

tribution also have been entered into (prior to the institution of this lawsuit) and provide for the Film to be distributed through defendant Twentieth Century Fox Home Entertainment LLC." Slizewski further testified:

> [T]he company has made commitments for a number of years through I think 2015 here in the United States for this particular picture and continues to, on a regular continuous basis, invest money into this title and to invest the overall sales effort in this title, everyone from television sales staff, frankly to the participation staff where I work in the company are dedicating some amount of their time to the continued distribution, and all the back office support related to this particular title, and frankly, to keeping this title out in the marketplace, out in the DVD marketplace, out in the television marketplace.

**[8]** Nonetheless, Petrella argues that there is a triable issue because the defendants earned a substantial profit as a result of the delay and, she alleges, would not have done anything different, or been in any better position, had the suit been filed sooner. We disagree. In *Jackson v. Axton*, 25 F.3d 884 (9th Cir. 1994), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), we found prejudice after a delay of 18 to 22 years, despite the defendant's profit from the delay, and without any assertion that he would have acted differently had the suit been filed sooner. *Jackson* concerned an ownership dispute over the song "Joy to the World." During the period of the plaintiff's delay, the defendant had "arranged his business affairs around the Song, promoted the Song as his own, licensed the Song many times to third parties, and sold the Song . . . . [N]umerous business transactions ha[d] been made in reliance on [the defendant's] sole ownership of the Song." *Id.* at 889-90. This was sufficient to support the laches defense.

Our ruling in *Grand Canyon Trust v. Tucson Electric Power Co.*, 391 F.3d 979 (9th Cir. 2004), where we declined

to find expectations-based prejudice, does not dictate a contrary result. There the Tucson Electric Power Company received a permit from the Environmental Protection Agency in 1977 authorizing the construction of a coal-powered electric generating plant, including two 350-megawatt coal-fired steam electric generating units. *See id.* at 983. One year after the permit was issued, Congress amended the Clean Air Act to add new requirements for such construction, but provided that permits already obtained would remain valid — and therefore not subject to the new requirements — so long as (1) construction commenced by March 19, 1979; (2) construction was not discontinued for a period of 18 months or more; and (3) the project was completed within a "reasonable" amount of time. *See id.* The parties disputed whether these requirements were met, but all agreed that Tucson Electric completed construction of its two units in 1985 and 1990. *See id.* at 984.

In Spring 2001, after Tucson Electric publicly announced a plan to construct two additional coal-fired units, Grand Canyon trust, a non-profit environmental organization, became interested in the validity of the 1977 permit for the first time. *See id.* After conducting an investigation and concluding that the permit was invalid, Grand Canyon brought a citizen enforcement action under the Clean Air Act. *See id.* The district court granted summary judgment, concluding Grand Canyon's suit was barred by laches. *See id.* at 987-88. The court found expectations-based prejudice because, if it granted the relief Grand Canyon sought, Tucson Electric would be required to replace the originally installed equipment, which could cost up to $300 million. *See id.* at 988. We reversed:

> We do not see how this delay prejudiced Tucson Electric. Rather, it appears that Grand Canyon's delay worked to the benefit of Tucson Electric because it allowed Tucson Electric the opportunity to recover some or all of its investment in [the units]

before this suit was filed. By contrast, if Grand Canyon had brought this action immediately after construction on each [u]nit was completed, and had the court held that Tucson Electric was required to replace the equipment it had just installed, Tucson Electric's loss would have been total. The original [u]nits would not have operated for a single day, and Tucson Electric would not have had the opportunity to recover any part of its immense investment. But in actual fact, Grand Canyon's delay allowed Tucson Electric to operate [the two units] for many years before having to replace them. Indeed, the longer the delay in bringing the suit, the greater the benefit — not the detriment — to Tucson Electric.

*Id.* at 988-89.

**[9]** In short, Tucson Electric benefitted because the delay gave it time to recoup its already completed investment. That is not the case here. Rather, over the full 18 year period of Petrella's delay, the defendants invested financial and other resources in marketing, advertising, distributing and promoting the film, totaling $8.5 million domestically. They continued to make business decisions and enter into contracts relying upon their belief that they were the rightful owners of the right to exploit *Raging Bull*. To the extent they should be proved wrong in their legal assumption through this litigation, the anticipated profits from these investments and licensing agreements — the expectation of which underlay their business decision making — would wind up in Petrella's pocket. That is the essence of expectations-based prejudice. The district court was justified in so finding, invoking the venerable Judge Learned Hand:

In the copyright context, the most-repeated justification for the doctrine [of laches] was penned by Judge Learned Hand: "It must be obvious to every one familiar with equitable principles that it is inequita-

ble for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win." *Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916).

*Danjaq*, 263 F.3d at 951.

**[10]** Accordingly, we hold that Petrella's copyright infringement claim is barred by laches. We therefore do not reach the merits of the copyright infringement claim itself.[4]

## II.   Unjust Enrichment and Accounting

Petrella also sued for unjust enrichment and accounting, arguing that if the defendants were co-owners rather than infringers of the book, they would have had an ongoing duty to account to and pay Petrella for any monies derived through the exploitation of the book and its derivatives. *See Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984) ("A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright . . . . [This duty] comes from equitable doctrines relating to unjust enrichment

---

[4]We reject Petrella's argument that the district court erred by ignoring evidence of the defendants' willful infringement. The laches defense cannot apply when the infringement "occurs with knowledge that the defendant's conduct constitutes copyright infringement." *Danjaq*, 263 F.3d at 957 (internal quotation marks omitted). However, willful or "deliberate" infringement "must mean more than simply not unintentional copying, connoting something along the lines of piratical conduct." 3 Nimmer § 12.06[B][5] (footnotes omitted). "[A] party accused of infringement, who reasonably and in good faith believes the contrary, is not willful." *Id.* Petrella has failed to present evidence sufficient to raise a genuine issue of material fact as to the existence of willful infringement.

and general principles of law governing the rights of co-owners." (internal quotation marks omitted)).

**[11]** Recovery of an unjust enrichment is an equitable remedy. *See McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1093 (9th Cir. 2003). Seeking an accounting, where the accounting is not provided for by contract, is also an equitable remedy. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Because laches is an equitable defense, *see Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002), we agree with the district court that laches also bars Petrella's unjust enrichment and accounting claims. *See McKesson*, 339 F.3d at 1093 (rejecting the plaintiff's unjust enrichment claim based on the equities); *Ronald E. Dimock, Dimock: Intellectual Property Disputes: Resolutions and Remedies* § 18.2(a)(i) (2008) ("since an accounting of profits is an equitable remedy, the plaintiff may be refused the remedy upon equitable grounds," such as a "long delay in commencing the proceedings") (footnotes omitted)).

### III.   Sanctions and Attorney's Fees

The defendants contend they are entitled to sanctions under Rule 11 and attorney's fees for Petrella's alleged unjustified filing and prosecution of this action, and ask that we remand for the district court to reconsider its denial of their sanctions and fees motions. We hold that the district court did not abuse its discretion in denying the motions.

### 1.   *Rule 11 Sanctions*

Federal Rule of Civil Procedure 11 provides for the imposition of sanctions when a filing is frivolous, legally unreasonable, without factual foundation or brought for an improper purpose. *See Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1177 (9th Cir. 1996).

**[12]** The district court cited *White v. General Motors Corp., Inc.*, 908 F.2d 675, 682 (10th Cir. 1990), for the proposition that although "[p]art of a reasonable attorney's prefiling investigation must include determining whether any obvious affirmative defenses bar the case[,] . . . [a]n attorney need not forbear to file her action if she has a colorable argument as to why an otherwise applicable affirmative defense is inapplicable in a given situation." The court found that Petrella had a reasonable belief that she could overcome the laches defense because laches is an equitable doctrine involving many variables, and the case was less clear cut than *Danjaq*. The district court concluded that sanctions were therefore not appropriate. We agree.

### 2.   *Attorney's Fees Under 17 U.S.C. § 505*

Under the Copyright Act, a district court has discretion to award attorney's fees to the prevailing party. *See* 17 U.S.C. § 505; *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) (reading § 505 as giving a district court broad discretion in deciding whether to award fees). "A district court's fee award does not constitute an abuse of discretion unless it is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 556 (9th Cir. 1996) (internal quotation marks omitted). "In deciding whether to award fees under the Copyright Act, the district court should consider, among other things: the degree of success obtained on the claim; frivolousness; motivation; objective reasonableness of factual and legal arguments; and need for compensation and deterrence." *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996).

**[13]** In denying attorney's fees, the district court evaluated several of these factors. The court denied the motion because it had "not grant[ed] summary judgment based on a lack of evidence of infringement, but solely on the ground that Plaintiff's claims were barred by laches." The court also concluded

that an award of attorney's fees in this case "would have a deterrent effect upon other copyright owners in *Abend* situations who have valid claims," and "[s]uch a result would not 'further the policies of the Copyright Act.' " Because we agree that Petrella's attempt to distinguish *Danjaq* both legally and factually was not unreasonable, and there is no evidence of improper motive, the district court did not abuse its discretion by denying attorney's fees.

## CONCLUSION

We hold that Petrella's copyright, unjust enrichment and accounting claims are barred by laches, and we therefore affirm the district court's grant of summary judgment in favor of the defendants. We also hold that the district court did not abuse its discretion by denying the defendants' motions for sanctions and attorney's fees. The parties shall bear their own costs on appeal.

**AFFIRMED.**

---

W. FLETCHER, concurring:

I concur in Judge Fisher's opinion, which faithfully applies our circuit's law of laches in copyright cases. But I do so only because we are compelled to follow our opinion in *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001).

There is a severe circuit split on the availability of a laches defense in copyright cases. In the Fourth Circuit, there is no laches at all. If a copyright suit is brought within the statute of limitations, it may go forward. *Lyons P'ship. L.P. v. Morris Costumes, Inc.* 243 F.3d 789, 797-98 (4th Cir. 2001). In the Eleventh Circuit, "there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run. Only in the most extraordinary circumstances will

laches be recognized as a defense." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l,* 533 F.3d 1287, 1320 (11th Cir. 2008). Even if laches is found, "laches serves as a bar only to the recovery of retrospective damages, not to prospective relief." *Id.* at 1321. In the Second Circuit, laches is available as a bar to injunctive relief but not to money damages. *See New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-85 (2d Cir. 1989). In the Sixth Circuit, laches is available in only "the most compelling of cases." *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 233 (6th Cir. 2007).

Our circuit is the most hostile to copyright owners of all the circuits. In the Ninth Circuit, laches can bar all relief, both legal and equitable, when "(1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice." Maj. Op., at 10176 (citing *Danjaq*, 263 F.3d at 951).

There is nothing in the copyright statute or its history to indicate that laches is a proper defense to a suit brought under the Act. The Copyright Act of 1909 ("1909 Act") did not contain a statute of limitations. Pub. L. No. 60-349, 35 Stat. 1075. Federal courts applying the 1909 Act used state statutes that provided various limitations periods, and Congress eventually became dissatisfied with the resulting problem of forum shopping by plaintiffs. S. Rep. No. 85-1014, *reprinted in* 1957 U.S.C.C.A.N. 1961, 1961. In 1957, Congress amended the 1909 Act to provide a three-year statute of limitations. Act of September 7, 1957, Pub. L. No. 85-313, 71 Stat. 633. The accompanying Senate Report noted that the adoption of a federal limitations period would extinguish equitable defenses such as laches. S. Rep. No. 85-1014, *reprinted in* 1957 U.S.C.C.A.N. 1961, 1963 ("[C]ourts generally do not permit the intervention of equitable defenses or estoppel where there is a [statute of] limitation on the right" (quoting H. Rep. No. 85-150)). The Copyright Act of 1976 ("1976 Act") replaced the 1909 Act. The 1976 Act re-enacted the three-year limita-

tions period for civil copyright claims using language identical to the 1957 amendment. Pub. L. No. 94-553, § 507(b), 90 Stat. 2541, 2586. Laches in copyright cases is thus entirely a judicial creation. And it is a creation that is in tension with Congress' intent.

Modern courts seeking to justify the application of laches in copyright cases typically quote from Judge Learned Hand's opinion in *Haas v. Leo Feist Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916):

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win. If the defendant be a deliberate pirate, this consideration might be irrelevant . . . ; but it is no answer to such inequitable conduct, if the defendant Feist is innocent, to say that its innocence alone will not protect it. It is not its innocence, but the plaintiff's availing himself of that innocence to build up a success at no risk of his own, which a court of equity should regard.

*See*, *e.g.*, Maj. Op. at 10183-84 (quoting from this passage); *Danjaq*, 263 F.3d at 957 (same). This passage from Judge Hand is a classic invocation of equitable estoppel, which is distinct from its equitable cousin, laches. *Compare* 6 William F. Patry, *Patry on Copyright* § 20:55 (2012) (criticizing *Danjaq* for failing to distinguish between equitable estoppel and laches).

The elements of an equitable estoppel defense have been variously stated. We wrote in a copyright infringement case:

Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) (internal citation omitted). The Second Circuit wrote more succinctly, but to roughly the same effect, in a copyright case:

Under federal law, . . . a party can be estopped from pursuing a claim where: (1) the party makes a misrepresentation of fact to another party with reason to believe that the other party will rely on it; (2) the other party relies on the misrepresentation to his detriment.

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (internal citation omitted). Equitable estoppel can be a complete defense against a claim, as to both legal and equitable remedies. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (en banc).

The elements of a laches defense are less demanding. In our circuit, laches in copyright cases does not require actual knowledge by the copyright owner of the defendant's infringement. It requires only that the owner "should have known" of the infringement. *See Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000). A laches defense is available to an infringer so long as the infringer is not a "deliberate pirate," to use Judge Hand's phrase, whom our circuit defines as a "willful infringer." *Danjaq*, 263 F.3d at 956-59. A showing of actual harm to the defendant is not necessary. An infringer can establish expectation-based prejudice

by showing that he has invested money to exploit the copyright, whether or not he has made a profit as a result of the owner's delay. Maj. Op. at 10182-83.

Our circuit has taken a wrong turn in its formulation and application of laches in copyright cases. We should revisit our case law to provide appropriate protection to innocent copyright owners who have brought infringement suits within the statute of limitations. A recognition of the distinction between equitable estoppel and laches would be a good place to start.