Filed 6/25/13  Majeske v. DRS Technologies CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STEVEN MAJESKE,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>DRS TECHNOLOGIES, INC., et al.,<br><br>　　　Defendants and Respondents. | B236760<br><br>(Los Angeles County<br>Super. Ct. No. BC429031)<br><br>**ORDER MODIFYING OPINION**<br>**NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on June 3, 2013, and not certified for publication, be modified as follows:

1.  On page 8, line 7, after the numeral (3), delete "DRS" and insert "STS."

2.  On page 9, first line, delete the word "corporate" and insert the word "divisional."  On the second line, delete the word "divisional" and insert the word "corporate."

3.  On pages 10-11, the third paragraph reads as follows:

"Even assuming DRS had knowledge of the problems with the SRP and its effect on future employee transfers and assuming it had the duty to disclose that information, there is still the question of reliance.  Majeske failed to establish that had he known of the method of accounting, he would have opted for the Hughes plan.  He admitted he did not

understand the fine points of accounting.  He also stated he received a $30,000 retention bonus for staying at DRS and actually liked the program.  He did not establish that the Hughes Plan would have allowed him to transfer between divisions at Raytheon.  He could not prove that the only reason he stayed at DRS was because of the SRP.  Moreover, Majeske did not establish that the inability to transfer was the reason hindering his employment at DRS and thus his ability to stay in the SRP.  Majeske was not ordered to transfer divisions.  He viewed transferring as the only way around his conflict with Viviano.  A trier of fact could reasonably infer that in a different economic climate, the costs of the SRP might not have affected Majeske's ability to transfer.  Certainly there was the possibility that at the time of the SRP presentation, Majeske would not have cared at all about the way the costs of the SRP were expensed and would have made his decision to enroll in the SRP even if the disclosure had been made.  Majeske failed to present substantial responsive evidence of misrepresentation, constructive fraud or fraud."

It should read:

"Even assuming DRS had knowledge of the problems with the SRP and its effect on future employee transfers and assuming it had the duty to disclose that information, there is still the question of reliance.  Majeske did not demonstrate that there was a triable issue of fact that had he known of the method of accounting, he would have opted for the Hughes plan.  He admitted he did not understand the fine points of accounting.  He also stated he received a $30,000 retention bonus for staying at DRS and actually liked the program.  He did not produce evidence that the Hughes Plan would have allowed him to transfer between divisions at Raytheon.  He did not place evidence in the record relevant to the issue that the only reason he stayed at DRS was because of the SRP.  Moreover, there was no evidence that Majeske's inability to transfer was the reason hindering his employment at DRS and thus his ability to stay in the SRP.  Majeske was not ordered to transfer divisions.  He viewed transferring as the only way around his conflict with Viviano.  Majeske failed to present substantial responsive evidence of misrepresentation,

constructive fraud or fraud to demonstrate the existence of a triable issue of material fact."

Appellant's petition for rehearing is denied. The foregoing does not change the judgment.

**PERLUSS, P. J.**                    **WOODS, J.**                    **ZELON, J.**

Filed 6/3/13 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STEVEN MAJESKE, | B236760 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC429031) |
| v. | |
| DRS TECHNOLOGIES, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David L. Minning, Judge.  Affirmed.

Fersguson Case Orr Paterson, Wendy C. Lascher and Meghan B. Clark; Law Office of Vida M. Holguin and Vida M. Holguin for Plaintiff and Appellant.

Gordon & Rees San Francisco and Don Willenburg; Gordon & Rees Los Angeles, Stephen E. Ronk, Anthony J. Bellone and Jennifer L. Ghozland for Defendants and Respondents.

_____

In 2009, appellant Steven Majeske (Majeske) was terminated from his employment at DRS Sensors and Targeting Systems, Inc., (hereinafter STS) a subsidiary of DRS Technologies, Inc. (DRS, collectively referred to as respondents). He filed an action for wrongful termination and several other causes of action against respondents. Respondents filed a motion for summary judgment and the trial court granted summary adjudication on five causes of action. The case proceeded to a jury trial on the remaining two causes of action (age discrimination and wrongful termination). The court granted a motion for directed verdict on those two causes of action and entered judgment in favor of respondents.

Majeske appeals and we affirm.

*FACTUAL & PROCEDURAL BACKGROUND*

The following facts are taken from the papers submitted in support of the motion for summary judgment.

In 1980, Majeske was hired as a systems engineer at Hughes Aircraft. Hughes paid for him to enroll in a Master's in Business Administration from Pepperdine University. In 1988, Majeske enrolled in the pension plan offered by Hughes.

In 1997, Raytheon purchased Hughes and took over the administration of the pension plan (hereinafter referred to as the Hughes Plan). As condition of the Hughes acquisition, the Department of Justice ordered Raytheon to stop doing business on certain infrared military technology. In addition, Majeske and other former Hughes engineers were banned from working for Raytheon for three years. Raytheon then sold its infrared technology group to DRS and Majeske was given the option of going to work for DRS. Majeske accepted a job with DRS in October 1998. He was given the option of returning to Raytheon after the three-year period, but had to do so before the expiration of five years (in 2003), in order to "bridge back," i.e. return to participation, in the Hughes Plan. He did not sign a written contract of employment with DRS.

Near the end of the three-year period, in 1991, DRS wanted to retain Majeske and the other former Hughes employees, so to induce them to stay it created a retirement plan

(the SRP) which was designed to "make employees whole" and "mirror" the benefit calculations and features of the Hughes Plan.

In September 2001, DRS representatives met with certain former Hughes employees and explained the SRP to them. They were given a written summary of the SRP.

Andrea Mandel, the DRS vice-president of Human Resources, told them the SRP was a "nonqualified unfunded plan," which would be paid from the general assets of the company. She also told them that if DRS entered bankruptcy proceedings, they would be treated like any other creditors. She did not discuss how the plan expenses would be borne by DRS. She knew that all other employee benefit plans were allocated out to the individual's organizations, and assumed the SRP would be expensed the same way, but it was never discussed at that meeting. Majeske admitted that if she did say that the SRP was payable out of the general assets of DRS, he did not know accounting "to that level." Majeske understood that the DRS board of directors could terminate the plan. He did not know if the Hughes plan could be terminated.

Close to the end of the five-year term in which Majeske could choose to reenroll in the Hughes plan, Majeske compared his retirement benefits in the SRP. He applied for and received a job offer from Raytheon. He told his supervisor at DRS that he was concerned because he would receive less from SRP than the Hughes Plan. His supervisor, Bob Duvall, assured him that DRS would fix the issue. In September 2003, Majeske and other participants in the SRP received a memorandum from Fred Marion, President of the DRS Electro Optical Systems Group, stating that DRS intended to provide a supplemental retirement benefit that would make the participants "whole" if they did not re-enroll in the Hughes plan. DRS then amended the SRP.

DRS also offered Majeske a $30,000 retention bonus and Majeske enjoyed working at DRS. Majeske elected to remain at DRS. In 2004, he was given the position of "Project Manager 5."

6

Under the SRP, a participant could retire and receive benefits at age 65 or anytime after 55, when the sum of the employee's age plus years of service equaled 75 (the Magic 75).

During the period from 1998 through October 2004, Majeske received written performance reviews from DRS with ratings of "5" for "outstanding," and "4" for "exceeds expectations." His supervisors at the time were Robert Duvall and James Neu.

In 2004, Neu assigned Majeske to take over a troubled program called CETS. Neu gave Majeske the highest performance rating for 2004.

In October 2004, Neu was replaced by Robert Viviano.

In 2005, Majeske received a performance review of "3" for "meets expectations." He did not receive any performance reviews after 2005.

In 2005, Viviano removed Majeske from CETS. In 2005 or 2006, he placed Majeske on the Tank Urban Survivability Kit (TUSK) program. Viviano then placed Majeske on the Crosshairs program in 2006.

DRS lost the Crosshairs program to another company. Majeske admitted he had some responsibility for the loss of the Crosshairs program.

Around this time, Viviano stopped assigning work to Majeske. Viviano said he was not qualified to be a program manager, but admitted that Majeske was an "above average" proposal writer. Viviano told Majeske he had no work for him. Majeske did not receive any pay raises and was told that his salary was higher than the Project Manager 5 band.

Certain STS supervisors told Majeske that Viviano did not like him, so Majeske sought advice from Viviano's supervisor, Jimmy Baird. Baird advised Majeske to transfer out of Viviano's division.

Majeske was able to secure a transfer to the Homeland Security Solutions (HSS) division of DRS. HSS discovered that because the cost of the SRP plan was borne by the employee's division and not at the corporate level, it could not hire Majeske. Prior to this time, Majeske had never heard that the SRP adversely affected his ability to transfer. Nor had anyone ever discussed with him the cost of the SRP before.

In 2008, Michael Tortorella, also a former Hughes employee who was enrolled in the SRP, sought a transfer to another division and was told that the SRP made him "unaffordable" and prevented him and Majeske from transferring.

Rosarie Holland, Human Resources Manager for STS, said Viviano mentioned on more than one occasion that he wanted to get rid of the "Torrance employees" which included Majeske's group from Hughes.

In 2007, Majeske was 50 years old, had 27 years of employment, and thus was less than five years away from the Magic 75.

In August 2008, Mandel told Majeske and the other SRP participants that DRS was going to freeze the SRP benefits because it was too expensive. Majeske and Tortorella wrote to the CEO of DRS, Mark Newman, about the situation. Newman reinstated the SRP in September 2008, and said to Mandel and COO of DRS, Bob Mehmel, that the cost of SRP should not be an impediment for employees to transfer within DRS. Viviano expressed concern to other DRS managers about the costs of the SRP. Other managers also discussed the pension liabilities of the former Hughes employees.

In 2008, DRS hired another project manager Jennifer Ferrario, as a Project Manager 4. Ferrario was over ten years younger than Majeske.

In 2009, DRS hired Kwang Lee, who was younger than Majeske, as a Project Manager 5.

In July 2009, the Department of Defense cancelled the Future Combat Systems Program (FCS) at STS. Majeske had not worked for FCS in 2009.

On July 23, 2009, 19 employees, including Majeske and Tortorella, were terminated from employment at DRS. Majeske and Tortorella were the only ones not working full-time on FCS. Two employees who were still enrolled in SRP remained. Majeske's compensation at that time was $167,000. Carolyn Rose, Director of Human Resources for DRS, performed a "disparate impact analysis" prior to the layoff and determined there was no disparate impact with respect to age.

The DRS layoff justification form stated that there was "insufficient work" for Majeske and that he did not have the "required skills or background." It compared him with Kwang Lee and Richard Willis, both Project Manager 5s. DRS claimed Lee was fluent in Korean, which was needed for the position and Willis had space flight experience that Majeske did not have. Majeske did in fact have experience with space flight instruments.

In December 2009, Majeske filed a complaint for age discrimination, wrongful termination, fraud and intentional deceit, constructive fraud, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing against respondents. The complaint was later amended to add a cause of action for unfair competition.

This case was found to be related to Tortorella's wrongful termination lawsuit, *Tortorella v. DRS and STS*, Los Angeles County Superior Court Case No. BC431080, which raised similar claims. Majeske's case was designated as the lead case.

Respondents filed a motion for summary judgment, or in the alternative, summary adjudication. On May 23, 2011, the trial court granted summary adjudication of the third (fraud and intentional deceit), fourth (constructive fraud), fifth (negligent misrepresentation), sixth (breach of implied covenant of good faith and fair dealing) and seventh (unfair competition) causes of action. On July 11, 2011, a jury trial commenced on the two remaining claims of age discrimination and wrongful termination. After both sides had rested, Majeske filed a motion to amend the complaint to add allegations of retaliation to his cause of action for wrongful termination and to include a cause of action for interference with prospective economic advantage. The court denied the motion. Respondents moved for nonsuit on the two causes of action, and the court instead, granted judgment by directed verdict in respondents' favor.

*CONTENTIONS ON APPEAL*

Majeske appealed. He contends: (1) the trial court erred in granting summary adjudication on the fraud, constructive fraud, negligent misrepresentation and unfair competition causes of action; (2) the trial court erred by directing a verdict at the trial of

9

the age discrimination and wrongful termination causes of action; and (3) the trial court erred in denying the motion to amend the complaint to add a retaliation cause of action.[1]

*DISCUSSION*

*1. Summary adjudication*

We review the grant of a motion for summary judgment de novo, considering all the evidence set forth in the pleadings except that to which successful objections have been made. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334.) Accordingly we go through the same three-step process required of the trial court, that is, we (1) identify the issues framed by the complaint, (2) determine whether the moving party has made an adequate showing negating the opponent's claim, and (3) determine whether the opposing party has raised a triable issue of material fact, resolving any doubts in favor of the opponent. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562.) The moving party must make a prima facie showing of the nonexistence of a triable issue of fact, and if this burden is met, the burden shifts to the opponent to show the existence of a triable issue. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

In their motion for summary judgment, respondents contended that the DRS representatives explained to Majeske and other former Hughes employees in 2001 that SRP was an unfunded, nonqualified plan to be paid out of DRS's general assets. No one discussed about how DRS would account for the plan and Mandel said she was not even aware of where the expense of the plan would be borne or of the accounting logistics. Majeske was given a summary plan description. Later the plan was adjusted to meet concerns of those employees and Majeske was given another summary plan description. Respondents contend that there were no misrepresentations or fraudulent statements made to Majeske, nor did he ask. They contend that he was terminated because of the

---

[1]    Majeske did not appeal the ruling on the breach of implied covenant of good faith and fair dealing.

10

loss of the FCS contract and because he had less than stellar performance reviews in his later years of employment.

In his opposition to the summary judgment motion, Majeske contended: (1) the motion for summary judgment should have been taken off calendar because respondents failed to produce computer-organized discovery ("metadata"[2]) as requested; (2) he established a prima facie case of age discrimination and wrongful termination; (3) respondents failed to disclose the fact that DRS was financially responsible for the SRP; (4) Mandel knew how the SRP costs were expensed and did not tell Majeske or the other Hughes employees; (5) Majeske's reliance on the representations about the SRP caused him to lose his lucrative benefits under the Hughes-Raytheon plan and his inability to transfer employment within DRS removed him from career advancement opportunities, setting him up for termination; (6) respondents did not abide by their promises regarding the SRP, did not follow its policies regarding transfer and layoff and essentially terminated Majeske to avoid paying SRP costs; and (7) DRS's misrepresentations constituted unfair business practices. Majeske stated in his memorandum of points and authorities: "The misrepresentation that forms the backbone of [Majeske's] fraud claim is [respondents'] failure to disclose a material fact—that the SRP was expensed like all DRS benefits, at the divisional level. . . . Concomitant with the concealment of this material fact, [respondents] were representing affirmatively that the SRP would mirror the Hughes Plan and that it would make up for all losses by not bridging back into the Hughes Plan. This was not true because under the Hughes Plan, Hughes employees could transfer freely as the Hughes Plan was supported at the corporate level."

Majeske contends that the court erred in granting the motion for summary adjudication because DRS misrepresented SRP would mirror the Hughes plan and make up for what the participants lost when they left Hughes. He argues that DRS did not

---

[2]     Majeske uses the term "metadata" to describe information describing the history or tracking of an electronic document. He sought to obtain information about how and when his online performance reviews were accessed.

inform him and the others that the expenses of SRP would be handled at the corporate level, not the divisional level, thus making it impossible for him to transfer to another division, and because of these representations, Majeske did not return to Raytheon, and thus lost his chance to return to the Hughes plan.

### a. Misrepresentation and Fraud

The trial court was correct in finding that Majeske could not show a triable issue of fact as to the causes of action for misrepresentation, constructive fraud and fraud.

The elements of fraudulent deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; Civ. Code, § 1709 .)  Reliance is an essential element.  (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1110.)

The elements for fraudulent concealment are: (1) concealment or suppression of a material fact, (2) duty to disclose the fact, (3) intent to conceal or suppress with intent to defraud, (4) plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealment or suppression, and (5) resulting damage.  (*Jones v. Conoco Phillips* (2011) 198 Cal.App.4th 1187, 1198; *Marketing West, Inc. v. Sanyo Fisher* (1992) 6 Cal.App.4th 603, 612-613.)

Negligent misrepresentation is a form of deceit and its elements are: (1) misrepresentation of a material fact, (2) no reasonable grounds for believing it to be true, (3) intent to induce reliance, (4) plaintiff's ignorance of the truth and reliance thereon, and (5) damages.  (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962.)  It does not require intent to defraud.  (*Small v. Fritz Companies Inc.* (2003) 30 Cal.4th167, 173-174.)

"Actual reliance occurs when the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction.  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976.)" (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519.)

Constructive fraud occurs when someone in a confidential or fiduciary relationship to another induces justifiable reliance to the prejudice of the other. (Civ. Code § 1573; *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 129.) If there is no fiduciary relationship, the duty to disclose exists when the defendant has control over material facts which were not disclosed, either if it has exclusive knowledge of material facts, if it actively conceals a material fact, or when it makes partial representations of material facts but also suppresses some. (*Jones, supra*, 198 Cal.App.4th at p. 1199.)

Majeske contends that DRS knew that the SRP was expensed to the individual divisions and thus had a duty to disclose that the method of accounting would have an effect on his ability to transfer. The potential for problems with transferring directly affected his ability to reap the benefits of the SRP and thus was a crucial factor in his decision to participate in the plan and not to bridge back to the Hughes Plan. DRS' failure to inform him is the basis of his claims for fraud and negligent misrepresentation.

Even assuming DRS had knowledge of the problems with the SRP and its effect on future employee transfers and assuming it had the duty to disclose that information, there is still the question of reliance. Majeske failed to establish that had he known of the method of accounting, he would have opted for the Hughes plan. He admitted he did not understand the fine points of accounting. He also stated he received a $30,000 retention bonus for staying at DRS and actually liked the program. He did not establish that the Hughes Plan would have allowed him to transfer between divisions at Raytheon. He could not prove that the only reason he stayed at DRS was because of the SRP. Moreover, Majeske did not establish that the inability to transfer was the reason hindering his employment at DRS and thus his ability to stay in the SRP. Majeske was not ordered to transfer divisions. He viewed transferring as the only way around his conflict with Viviano. A trier of fact could reasonably infer that in a different economic climate, the costs of the SRP might not have affected Majeske's ability to transfer. Certainly there was the possibility that at the time of the SRP presentation, Majeske would not have cared at all about the way the costs of the SRP were expensed and would have made his

13

decision to enroll in the SRP even if the disclosure had been made. Majeske failed to present substantial responsive evidence of misrepresentation, constructive fraud or fraud.

   *b. Unfair competition.*

   In his complaint, Majeske alleged that the unfair competition claim was based on the same alleged misrepresentations about the SRP and that they were unfair or fraudulent claims in violation of Business and Professions Code sections 17200 et seq. In opposition to respondents' summary judgment motion, Majeske claims that the representations that the SRP plan was a "DRS plan" was likely to deceive him and thus constituted an unfair business practice. On appeal, however, Majeske contends that the unfair competition claim is based on his claim for age discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). He argues that because the cause of action was not based on fraud and misrepresentation, summary adjudication should not have been granted and that the unfair competition cause of action should have proceeded to trial along with the age discrimination cause of action.

   At the time of the summary judgment motion, there was no indication that Majeske was pursuing the theory based on age discrimination. Majeske stated that the basis of the unfair competition was that DRS was misrepresenting employee benefits in order to gain an advantage over other employers. He may not raise that claim for the first time on appeal. (*City of San Diego v. D.R. Horton* (2005) 126 Cal.App.4th 668, 685.) There is no evidence that DRS sought to unfairly compete by driving down its costs by hiring only younger employees. Summary adjudication was properly granted on this cause of action.[3]

---

[3]   In their reply to the summary judgment motion, respondents argued that Majeske's claims were preempted by ERISA (Employee Retirement Security Act of 1974, 88 Stat. 829 as amended, 29 U.S.C. § 1001 et seq.). The trial court did not address preemption in its order granting summary adjudication. Since we have found summary adjudication was properly granted on other grounds we do not address the preemption issue in this opinion.

14

## 2. *Directed verdict*

After the trial, respondents moved for nonsuit or partial nonsuit after the close of evidence on the ground that Majeske failed to introduce sufficient evidence as a matter of law to prove his claims for age discrimination and wrongful termination. Respondents alleged that Majeske did not demonstrate that his age was a motivating factor for his termination under a disparate treatment analysis, nor that their decision to terminate him had a disparate impact on the workforce as a group.

Code of Civil Procedure section 581c authorizes a motion of nonsuit after the plaintiff has presented his or her evidence in a jury trial. Here, since the motion was made after the presentation of both sides' evidence, the court treated it as a motion for a directed verdict.

A directed verdict may be granted when the court determines there is no substantial evidence to support the claim of the party opposing the motion or a verdict in its favor. The trial court gives the evidence of the opposing party all the value to which it is legally entitled and gives every legitimate inference from that evidence in favor of the party opposing the motion. (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 358; *Magic Kitchen v. Good Things International Ltd.* (2007) 153 Cal.App.4th 1144, 1154.) On appeal of an order granting a defendant's motion for a directed verdict in its favor, we review the evidence in the light most favorable to the plaintiff, resolving all conflicts and drawing all inferences in its favor and disregarding conflicting evidence. We reverse the judgment if there is substantial evidence that would tend to prove each of the elements of the plaintiff's case. (*Wolf v. Walt Disney Pictures and Television* (2008) 162 Cal.App.4th 1107, 1119.)

At trial, Mandel testified that she discussed the SRP with 22 former Hughes engineers in order to retain them, and told them it was an unqualified pension plan which was unfunded. She told them it would be equal to the Hughes plan and that the payments would come out of DRS' general assets. The issue of transferring to another division did not come up with Majeske until 2007.

15

Mandel admitted that retirement cost was a factor in transferring between divisions. But the cost of the SRP did not become an issue until long after 2003, the year in which the employees could bridge back to the Hughes Plan.

Majeske and Tortorella were on the layoff list because of the cancellation of a contract and not to retaliate against them. In 2009, after she received the layoff list, she had heard comments that Majeske did not have a good reputation and that he would not receive good references. No one suggested to Mandel that Majeske was laid off because of his age. Majeske was laid off because of insufficient work.

She also testified about the statistics regarding age and participation in the SRP. One other person who was 16 days younger than Majeske and who was enrolled in the SRP was not laid off. Majeske was the oldest SRP participant who had not reached retirement age. There were still SRP participants working at DRS at the time of trial. The average age of DRS employees before the layoff –48 – was the same as it was after the layoff. Mandel and Rose Holland are older than Majeske.

Viviano, the Vice President and General Manager of DRS, testified he did not recall if he looked at Majeske's performance reviews prior to the layoff and did not personally give him reviews. In 2007 and 2008, other supervisors were not assigning Majeske work. Viviano was not his supervisor during those years.

In 2008, Majeske was working for the RSTA division on a part-time basis. RSTA did not have enough work for Majeske or Tortorella. No one was willing to give Majeske assignments in 2008 because of his prior poor performance.

Majeske overran the costs on the Crosshairs program and received a bad performance review. There were cost overruns and delays on both the CETS and TUSK programs, which Majeske worked on. Majeske got a 2.5 rating for performance while working on the Tusk program. Majeske was an "adequate" proposal writer, but he performed unsatisfactorily on three programs. He had a lower "direct realization" score than other managers, that is, he spent less time on contracts resulting in payments to DRS.

16

Viviano said he never thought about how expensive Majeske was. The first time he heard of SRP costs was in 2008. He thought it was "a very disproportionate benefit" for only a few employees. He admitted having a conversation with Mandel expressing his displeasure about the SRP and did not remember saying he was happy to be rid of Majeske and his overhead.

Viviano testified the freeze of the SRP in 2008 made the division better able to compete in the marketplace but when the SRP was unfrozen, he felt the cost "wasn't going to bankrupt the division." He was concerned about losing people in the SRP program to other companies offering similar pension plans.

The loss of the FCS project resulted in a 20 percent revenue loss to DRS. Not only FCS employees were laid off. Nineteen people were laid off as a direct result of the loss of the FCS contract. Nine of the 19 individuals had a pension plan. There were eight people still at DRS who were enrolled in the SRP plan.

In his complaint, Majeske alleged age discrimination and disparate treatment in the form of the failure to increase his wages and termination of his employment. His wrongful termination cause of action was based on age discrimination.

The court indicated in its ruling for directed verdict that there was no evidence of a disparate impact on employees over 40 years old from the transfer policy and no evidence that the average age of the employees changed materially after the layoff. Then after the court stated it granted the motion, Majeske's attorney asked, "The motion as to which part because there w[ere] two parts to this motion for nonsuit? There was disparate impact and disparate treatment." The court responded. "It is the treatment. This is over with."

"'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds. [Citations.] Prohibited discrimination may also be found on a theory of 'disparate impact,' i.e. that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Guz v. Bechtel National Inc., supra*, 24 Cal.4th 317, 354, fn. 20; italics in original.)

Majeske did not prove a disproportionate effect of the layoff on older workers. Not all members of the group who were laid off were over 40 or SRP participants. (*Carter v. CB Richard Ellis* (2004) 122 Cal.App.4th 1313, 1326.) There was no impact on the average age of the company and no evidence that only older workers were laid off. All he was able to show was that he and Tortorella, both over 40 and both SRP participants, were laid off. This is not enough evidence of disparate impact.

As far as his theory of disparate treatment, he did not show any intentional discrimination. Mandel and Viviano were able to show numerous reasons for his layoff; his performance reviews, the lack of available work, the loss of the FCS contract, and his direct realization scores. In addition, the statistical evidence did not support any claim of intentional discrimination against older employees. There was evidence that the employees who were retained had unique skills and no evidence that the employees who were not laid off were only those younger than 40. The evidence that Majeske presented of animosity by Viviano was evidence of concern of costs over the retirement plan and not about his age.

### 3. Discovery of metadata

Prior to the order granting summary adjudication, Majeske sought discovery of computer data on his performance reviews. He contends that this "metadata" would show that he had not received his performance reviews through DRS' online review process. The trial court denied the motion.

A motion to compel discovery is reviewed for abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733.) When the facts asserted by the parties conflict, the trial court's factual findings will be upheld if they are supported by substantial evidence. (*Ibid.*)

However, even assuming that Majeske did not see his below average or negative reviews, he could not prove his case. It was not disputed that DRS lost an important contract prior to Majeske's termination, and Majeske acknowledged that he was responsible for the loss of the Crosshairs program and that Viviano did not like him. Any evidence of whether he saw his performance reviews would have been cumulative.

18

*4. Denial of motion to amend*

At the close of evidence, Majeske moved to amend his complaint to add retaliation as a basis for wrongful termination in his second cause of action, and to add a cause of action for intentional interfere with prospective economic advantage. The trial court denied the motion.

On appeal, he contends that evidence to support those amendments had already been presented at trial and thus there was no prejudice to respondents.

Code of Civil Procedure section 473, subdivision (a)(1) gives the court discretion to allow a party to amend a pleading in furtherance of justice.

Respondents contend that Majeske waited too long before making his motion to amend and had no good cause for the delay since he filed his complaint on December 30, 2009, and did not move to amend until July 26, 2011, after trial had essentially ended. In addition, respondents contend that the motion did not seek to allege any new facts, which Majeske himself admitted. Finally, respondents contends that the cause of action for retaliation was time-barred and meritless. Government Code section 12965 required him to commence his civil action on a FEHA-based claim within one year after his right to sue notice was issued by the DFEH. No protected activity under FEHA was alleged.

We review a denial of a motion to amend for abuse of discretion. (*Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612.) Although a court is allowed great liberality in permitting amendments (*Atkinson v. Elk* (2003) 109 Cal.App.4th 739, 761), the trial court must consider a number of factors, including the timing of the presentation of the amendment. (*Id*. at p. 613.) Unwarranted delay in presenting an otherwise valid amendment may justify a denial of a motion for leave to amend. (*P & D Consultants, Inc v. City of Carlsbad* (2011) 190 Cal.App.4th 1332, 1345 – amendment sought after trial readiness conference.) Majeske did not allege any new facts which would justify the delay in bringing the motion. The trial court did not abuse its discretion in denying the motion to amend.

*DISPOSITION*

The judgment (order granting summary judgment and order directing verdict) in favor of respondents is affirmed.  Respondents shall recover costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**